ALBERT F. ROOS ET AL., APPELLEES, V. CONSUMERS PUBLIC POWER DISTRICT, APPELLANT, CONSOLIDATED WITH DONALD H. SALLENBACH, APPELLEE, V. CONSUMERS PUBLIC POWER DISTRICT, APPELLANT.

106 N. W. 2d 871

Filed January 6, 1961. No. 34861.

*Blackledge & Sidner*, for appellant.

*Oscar A. Drake, John E. Dougherty*, and *James R. Ganz*, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

The plaintiffs brought separate actions for property damages sustained because of the negligence of the defendant in not properly maintaining its electric lines and in failing to properly inspect such lines and discover the defects therein which resulted in the plaintiffs' injuries. A verdict was returned by the jury for each of the plaintiffs. The defendant has appealed. The two cases were consolidated for trial in the district court and for the purpose of appeal to this court.

The plaintiffs Roos are the owners of a two-story hotel building and a one-story office building in Gibbon, Nebraska. The plaintiff Sallenbach was a tenant of the south office in the office building, which he was using as his office for the practice of medicine. The other office in the office building was immediately north of the doctor's office. It adjoined the hotel building to the north, and was rented to Max Wilkie, a livestock dealer. On February 27, 1958, the office building was destroyed and the hotel building damaged by an explosion. The actions presently before the court are for the damages resulting from this explosion.

The evidence shows that during the evening of February 26, 1958, a storm struck the area in and around Gibbon, which extended into the next day. The evidence is that the storm brought rain, sleet, and snow, accompanied by high, gusty winds and freezing temperatures. The storm was described as a blizzard of unusual severity. At about 3 a.m., on February 27, 1958, a primary conductor wire broke and the live ends came in contact with the ground. The broken wire came in contact with telephone service wires passing under the distribution lines of the electric company. There is evidence also that one of the broken primary wires came in contact and fused with a natural gas regulator, and caused high-voltage electrical current to energize the gas main of the gas company that services the area.

The area involved is a distance of 2 blocks in an east and west alley between LaBarre Avenue and Niles Street. The alley was immediately south of the doctor's office hereinbefore described. The telephone wires which came in contact with the broken primary wire entered an underground telephone cable running north and south on LaBarre Avenue, which cable had been installed prior to the paving of LaBarre Avenue. Subsequent to the paving of LaBarre Avenue the gas company laid a gas main in the alley which crossed LaBarre Avenue at its intersection with the alley. The gas main had been forced through under the pavement and, unknown to anyone until after the explosion, it passed immediately under and in contact with the above-mentioned telephone cable. Due to the energizing of the telephone wires or of the gas main, or both, arc burns occurred at the point where the telephone cable and gas main were in contact in the intersection of the alley with LaBarre Avenue. As a result a hole was burned in the cable and in the gas main, the latter permitting a large amount of natural gas to escape. The escaping gas followed the sand-and-gravel fill around service lines leading into

the offices of Dr. Sallenbach where, after an accumulation of gas, it came in contact with the pilot lights of an automatic gas furnace and a water heater, and the explosion resulted. It is not disputed that the breaking of the power line precipitated the chain of events which brought about the explosion. The defendant does contend that the installation of the gas main across LaBarre Avenue in such a way as to be left in contact with the telephone cable was an intervening factor which would relieve it from liability. The complete answer to this contention is that the contact of the gas main and the telephone cable was a condition and not an intervening cause as that term is used in the law of negligence.

The causes of action of the plaintiffs are based on a charge of negligence by the defendant in the following respects: (1) Defendant negligently and carelessly maintained the high-voltage electric line after it became weakened by stress from long use which made it unfit for use on February 27, 1958; and (2) that defendant negligently failed to properly inspect the electric line when such an inspection would have revealed its dangerous condition. We point out that plaintiffs, by pleading acts of negligence as their causes of action, may not rely upon the doctrine of res ipsa loquitur. Miratsky v. Beseda, 139 Neb. 229, 297 N. W. 94; Security Ins. Co. v. Omaha Coca-Cola Bottling Co., 157 Neb. 923, 62 N. W. 2d 127; Benedict v. Eppley Hotel Co., 161 Neb. 280, 73 N. W. 2d 228; Weston v. Gold & Co., 167 Neb. 692, 94 N. W. 2d 380. The burden of proving the acts of negligence alleged is upon the plaintiffs. Defendant contends that plaintiffs have not met this burden and that its motions for directed verdicts should have been sustained.

The defendant's power line was located on the north side of the alley. The break in the line occurred in the next block east of the block in which the Roos property was located. It was 21 feet from the west edge of this block to the first pole in the power line in this

block. It is designated in the record as pole 1. From pole 1 to the next pole to the east it was 96 feet. The latter pole is designated as pole 2. From pole 2 to the next pole to the east it was 107 feet. This latter pole is designated as pole 3. The break in the line is alleged to have occurred between poles 2 and 3, although there is evidence that it may have occurred at pole 2. The primary line consisted of three wires on cross-arms at the top of the poles. The primary line was a 2,400-volt line. Below the primary line on similar cross-arms was a distribution line which provided the electrical energy for electric light users in the area. Below the second series of cross-arms was a three-wire power line serving users of power in the area, which was attached to the poles with vertical brackets. The telephone service wires passed under the electric company's wires between pole 1 and pole 2. The wire that broke was the middle primary wire on the top series of arms. The voltage on the two lower lines was 240 volts.

There is evidence that the wire broke between poles 2 and 3. The evidence is not clear as to the exact place where the wire broke. The broken wire became detached from pole 2, making it necessary for the repairman to cut down the broken live wires at poles 1 and 3. It appears to be the theory of the plaintiffs that the wire broke close to the insulator on pole 2, since a part of the tie-wire which was also broken was on the conductor wire at the point of the break. It is evident on plaintiffs' theory that the west part of the broken wire contacted the gas regulator about 24 inches from the end and melted the wire at that point, leaving the 24-inch end of the wire near the regulator where it was found. This 24-inch section of the conductor wire is in evidence and designated as exhibit 1.

The plaintiffs called the witness W. F. Weiland, who qualified as an expert on the physical and mechanical behavior of metals as affected by stresses, fires, electrical currents, heat, and explosions under all circum-

stances and conditions. Professor Weiland determined the cause of the break to be a fatigue fracture which he described as follows: A fatigue fracture may start as a minute scratch on the wire, a scratch almost imperceptible to the human eye, and as it is bent back and forth a little bit over a period of years, a crack begins to form, and, eventually the crack travels into the wire to such an extent that the wire breaks. He stated that this may be a little crack or a little nick that has developed because of a slight line of corrosion on the wire, or a sharp corner, or it may develop because of impurities within the wire, and in each case it may continue to develop until it breaks because of what is technically called a fatigue fracture. Exposure to the elements, including fumes, gases, and moisture in the air, tends to accelerate the eating into the metal. As to whether or not an inspection could be made that would disclose such a defect, which he was able to discover only with a high-powered microscope, he stated that a visual inspection of areas of suspicion should be made, areas where tie-wires are used, or the twisting of the conductor wire is evident, as well as where sharp corners exist.

Professor Weiland also testified that the dangling of insulation from the wire, referred to in the record as festooning, was some indication of the age of the wire. He stated also that the sag in the wire, estimated by the employee who repaired the break to be 4 feet, was indicative of a fatigued wire.

The defendant called W. A. Richardson, who qualified as an expert in the field of municipal engineering which includes waterworks, sewerage, paving, electrical distribution systems, transmission lines, natural gas systems, power plants, and the like. He testified that the festooning of the insulation on the primary wires had no relation to the efficiency or safety of the power lines as it related to a break in the wire; and that it was common practice to construct high-tension power lines

with noninsulated wire. He testified that the ordinary life of copper wire such as was here used was approximately 50 years. He testified that the normal sag in such a line between poles 107 feet apart is 2 feet, that a sag of 4 feet does not affect the efficiency or safety of such a line, and that the additional sag would tend to reduce rather than increase the tension on the line. This evidence is not disputed.

There is no evidence in the record that the festooning of the insulation on the conductor wire or the sagging of the line in any manner contributed to the breaking of the wire. There is no evidence that adequate tolerance was not provided to protect against unusual weather and the accumulations of ice on the primary line. The local representative of the defendant testified that he observed the condition of these lines at frequent intervals by inspection by ground patrol. There is no evidence that any other type of inspection was required or was more practical. This is, we think, a fair statement of the facts upon which we must determine if the defendant was negligent in not properly maintaining the line, and whether or not it was negligent in not properly inspecting the line and discovering the fatigue fracture before the break occurred.

A power company engaged in the transmission of electricity is required to exercise reasonable care in the construction and maintenance of its lines. The degree of care varies with the circumstances, but it must be commensurate with the dangers involved, and where wires are designed to carry electricity of high voltage, the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its business to avoid injury to persons and property. Scott v. Claiborne Electric Cooperative (La), 13 So. 2d 524; Gellert v. Missouri Service Co. (Mo.), 221 S. W. 2d 177; Rice v. City of Lumberton, 235 N. C. 227, 69 S. E. 2d 543. Electric companies

are not insurers of the safety of the public and hence are not liable for injuries unless guilty of some wrong- ful act or omission. New Omaha Thompson-Houston Electric Light Co. v. Anderson, 73 Neb. 84, 102 N. W. 89. Such companies, being engaged in the transmission of a dangerous commodity, must anticipate and guard against events which may reasonably be expected to occur, and a failure to do so is negligence. A failure to anticipate and guard against a happening which would not have arisen except under exceptional or unusual circumstances is not negligence. Frerichs v. Eastern Nebraska Public Power Dist., 154 Neb. 777, 49 N. W. 2d 619. "The law does not require impossibilities of such companies in avoiding accidents and resulting injuries. In the erection and maintenance of their poles, wires, and other appliances, they are bound to anticipate only such combinations of circumstances and accidents and injuries therefrom as they may reasonably forecast as likely to happen, taking into account their own past experience and the experience and practice of others in similar situations, together with what is inherently probable from the condition of their appliances as they relate to the conduct of their business." 18 Am. Jur., Electricity, § 53, p. 448.

There is no evidence of faulty construction of the power line involved in this case. We accept the theory of the plaintiffs that the property damage sued for was the result of the break in the primary wire caused by the fatigue fracture, as described by the witness Weiland. It is not disputed that the line was constructed with a No. 4 triple-braided, weatherproof, copper wire, which was the proper kind to be used in this type of construction. There is no evidence in this record as to when the line was constructed, or of the age of the wire at the time of the break. There is no evidence of previous breaks in the wire, or of any other indication that the wire was defective. There is no evidence of any circumstances which would require the use of insulated

wire and, consequently, the festooning of the insulation is not evidence of negligence under the facts of this case. Beresford v. Pacific Gas & Electric Co., 45 Cal. 2d 738, 290 P. 2d 498, 54 A. L. R. 2d 910; Hardware Mutual Casualty Co. v. Tampa Electric Co. (Fla.), 60 So. 2d 179, 40 A. L. R. 2d 1293. There is no evidence that the abnormal sag of the wire in any manner contributed to the breaking of the wire. Interstate Power Co. v. Thomas, 51 F. 2d 964. The festooning of the insulation on the wire and the sag in the wire testified to, not being shown to have contributed to the breaking of the wire, are not a proximate or efficient cause thereof, and can afford no basis for recovery. Heidt v. Southern Telephone & Telegraph Co., 122 Ga. 474, 50 S. E. 361.

We point out also that there is no evidence that the defendant had any reasonable or practical means of locating the defective place in the line prior to its break, or that it had any knowledge of the defect. It is not shown that any special equipment existed that is of general use in the trade, which would have revealed the defect, the nonuse of which would amount to a failure to properly maintain the line in the exercise of due care.

There is evidence that the line, due to the unusual condition of the weather, had accumulated as much as 1 inch of ice, although the amount of the ice on the wire was in dispute. The ice on the wire and the weather conditions which produced it were undoubtedly contributing factors. The severity of the storm and its resulting effects are not alleged to be a proximate cause of the break in the wire, although they were admittedly a contributing factor.

We have come to the conclusion that a fatigue fracture such as described by the witness Weiland, which plaintiffs assert as the cause of the break, does not constitute proof of negligence. To so hold would make

the defendant an insurer against accident, which it is not.

It is contended that defendant was negligent in not properly inspecting the line in order to guard against defects. The local representative of defendant testified that he frequently patrolled these particular lines and that he observed nothing to indicate any defect in them. It is not urged that defendant was required to inspect otherwise than by visual observation on ground patrol. Plaintiffs' expert indicated that ground observation should reveal suspicious areas requiring close inspection. He did not testify that there was a suspicious area near the point of the break which a reasonable inspection should have detected. He only suggested it as a possibility which does not sustain a basis of recovery. There is no evidence that the place of the break was in an area that the witness considered suspicious. It seems to us that it would be unreasonable to require an inspection that would reveal a fatigue fracture which the witness was able to detect only with a high-powered microscope. To impose such a duty of inspection upon electric companies would be the equivalent of making them insurers against injury.

It is well established that when one relies upon pleaded acts of negligence as a basis of recovery, such acts must be proved, or be reasonably inferable from established facts. Under such circumstances negligence will not be presumed. We fail to find evidence of any act of the defendant the doing of which was negligence; nor do we find evidence of the failure to do some act which amounted to negligence.

Misfortunes do occur which result from inevitable accident. A wire may have some defect which the most astute care will not discern. A wire originally good may come to be defective and break, when no human skill could reasonably be expected to detect it. Such accidents, unaccompanied by any negligence on the part of an electric company, can afford no basis for a re-

covery. Only insurers against injury are liable for injuries resulting from such accidents. The only exception to this rule, if it may be called an exception, is where the facts are such as to result in an inference of negligence under the rule of res ipsa loquitur.

We necessarily conclude that negligence on the part of the defendant was not established in the respects charged and that the trial court erred in not sustaining defendant's motions for directed verdicts at the close of all the evidence. The judgments of the district court are reversed and the causes remanded with directions to sustain defendant's motions for judgments notwithstanding the verdicts of the jury.

REVERSED AND REMANDED.