PETER J. McGINN, APPELLEE, v. CITY OF OMAHA, A MUNICIPAL CORPORATION, APPELLANT.

352 N.W.2d 545

Filed June 8, 1984. No. 83-405.

Herbert M. Fitle, Omaha City Attorney, James E. Fellows and Timothy M. Kenny, for appellant.

John P. Miller of Miller Carpenter Rowen Fitzgerald & Coe, P.C., and Warren C. Schrempp and Peter J. Hoagland of Schrempp, Hoagland & Gray, and Melvin M. Belli, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

This is an action under the Nebraska Political Subdivisions Tort Claims Act against the City of Omaha, Nebraska, to recover damages for the personal injuries sustained by the plaintiff, Peter J. McGinn, when a silver maple tree located upon a city right-of-way fell upon his car during a severe storm. Following judgment for McGinn, the city appeals.

On June 12, 1980, at about 4:15 p.m., the plaintiff was driving in the vicinity of 32d and Center Streets. It was raining very hard and the wind was blowing. McGinn testified that he could barely see the stop lights. He decided to park, as he feared he might "rear end" somebody or that he would be "rear ended." As he slowed down to park on 32d Street, he saw a tree fall in front of his car. His only thought at that moment was to back up and park, but before he was able to do so he blacked out. A limb from a silver maple tree had fallen upon his car, rendering McGinn unconscious and pinning him inside the vehicle. He suffered severe injuries resulting in his present state of quadriplegia. Photographs taken after the accident revealed that the trunk of the tree was extensively decayed.

The petition alleged that the city was negligent in failing to inspect the tree for disease, decay, and structural defects, and in violating a city ordinance making it unlawful for a landowner to permit a dangerous tree to stand. The answer alleged that McGinn was contributorily negligent and that the

storm, which could not have been reasonably antici-pated, caused the tree to fall. The trial court rendered judgment in favor of McGinn and awarded $5 million in damages.

On appeal the city assigns as error the findings of the trial court that the city knew or should have known of the condition of the tree and that the city failed to properly maintain the tree.

Findings of fact made by the district court in cases brought under the Political Subdivisions Tort Claims Act will not be disturbed on appeal unless clearly wrong. *Garreans v. City of Omaha*, 216 Neb. 487, 345 N.W.2d 309 (1984); *Studley v. School Dist. No. 38*, 210 Neb. 669, 316 N.W.2d 603 (1982).

It is generally recognized that governmental units are liable under ordinary negligence principles for injuries or damages which result from a tree falling onto a public road from land in possession of the governmental unit. The rule is stated in *Pietz v. City of Oskaloosa*, 250 Iowa 374, 377, 92 N.W.2d 577, 579 (1958):

> The duty and liability of the City would seem to be the same as to any faulty street condition, i.e., reasonable care and diligence. 25 Am. Jur., Highways, section 490, states the rule to be, "A municipal * * * corporation * * * is ordinarily liable for injuries to travelers resulting from the fall of a tree growing on or overhanging the street or way, * * * provided it had actual or constructive notice of the dangerous condition and failed to take proper measures to remove."

The Nebraska rule with regard to street conditions is set forth in *Doht v. Village of Walthill*, 207 Neb. 377, 379, 299 N.W.2d 177, 178 (1980): "The Village is not an insurer of the safety of those using its public ways, but has the duty to use reasonable diligence to keep sidewalks in reasonably safe condition for the use of persons passing over them." See, also, Neb. Rev. Stat. §§ 23-2410 and 23-2411 (Reissue 1977).

McGinn appears to rely upon the following ordi-

nance as imposing a form of strict liability upon the city:

> It shall be unlawful for any property owner or occupant to permit to stand upon his property any dead tree, any dead part of a tree, any stump, any totally diseased or structurally weak tree, any structurally weak part of a tree, or any healthy tree or part of such tree which is a menace to public safety or which endangers any building or other property.

Omaha Mun. Code § 37-11 (1980).

McGinn has not shown that this ordinance is applicable to the city. At most, a violation of the ordinance would be evidence of negligence. *Whitcomb v. State Fed. Sav. & Loan Assn.*, 190 Neb. 26, 205 N.W.2d 652 (1973).

There was no evidence that the city had actual knowledge of the condition of the tree. Therefore, the plaintiff was required to prove that the city had constructive notice or knowledge of the condition of the tree. Constructive knowledge is that knowledge which one would possess if through the exercise of reasonable care he would have known such facts. Black's Law Dictionary (5th ed. 1979). See, *Acom v. Ziegler*, 102 Neb. 410, 167 N.W. 461 (1918); *Commonwealth v. Callebs*, 381 S.W.2d 623 (Ky. App. 1964). Under the plaintiff's theory of the case he had the burden of proving that if the city had carried out a reasonable inspection of the tree, it would have known of the defect in the tree and removed it. See, *Mosher v. State of New York*, 191 Misc. 804, 77 N.Y.S.2d 643 (1948); *Hosford v. Doherty*, 198 Neb. 211, 252 N.W.2d 154 (1977).

The uncontroverted evidence shows that the City of Omaha had instituted an inspection program to detect and remove hazardous trees from the city's streets. The department entrusted with the program was headed by a city forester and staffed by 26 field personnel and 1 secretary.

The department is responsible for the care and

management of all trees and woody ornamentals in the city, including programs for tree removal, maintenance, and planting. The area encompassed consists of the 90 to 95 square miles which make up the city and the 6,000 acres of parkland contained therein.

There are 59,610 street trees which are under the care of the department, as well as 153,000 trees which are located in city parks. The department also handles about 10,000 calls a year from owners of trees on private property who are seeking advice with regard to their trees or who seek to complain about hazardous trees.

An annual inspection program to check for hazardous trees is carried out each fall by five members of the department staff who are trained in forestry. Each member is given a map and assigned to an area of the city. Every street in the city is included in the program and inspection is made on a "street-by-street," "tree-by-tree" basis. Staffers check the trees for signs of a hazard while driving by in their cars. If problems are spotted, the inspector will get out of his car and walk around the tree, examining it for defects. Trees requiring removal are marked. A file card is prepared for that tree, and the tree is then listed as part of the contract package for tree removal. Such trees are cut down sometime during a period from November through March.

The members of the department also look for hazardous trees on a continuing basis throughout the year as they are performing their various field duties. Dr. Terry Tattar, a professor of plant pathology at the University of Massachusetts, testified that he was aware of few cities which had an inspection program such as Omaha's, and stated that Omaha's program was one of the best he had seen.

In June through October 1979 a census was taken of all street and park trees. The census was conducted by paid, part-time helpers trained and as-

sisted by the assistant city forester. The number of trees in each area of the city was recorded in a plat book. Trees were listed by groups, indicating approximate size, species, and condition.

The trial court found that the "windshield inspections" carried out by the city were a rather cursory attempt to fulfill its duty to inspect. A review of the evidence discloses no evidence that the inspection program conducted by the city was negligently designed or that the city was negligent as a matter of law in the way it carried out the program.

Dr. Harold McNabb, a forest pathologist employed by Iowa State University, testified as an expert witness for the plaintiff. He testified that silver maple trees are particularly susceptible to disease and decay and that, in his opinion, the city should implement a program to remove every silver maple 50 years of age or older. He estimated the age of the tree involved in the present case to be more than 50 years. He also testified that each silver maple should be examined every 5 years and that 15 to 30 minutes should be spent examining each silver maple. McNabb knew of no city in the United States with such a program of inspection. At one point Dr. McNabb testified that half of the city's street shade trees should be removed.

There are 17,500 silver maples on the streets of Omaha, which are valued as shade trees by residents of the city. The city forester estimated that 10,000 of these silver maples are over 50 years of age. The city forester stated that it would take six men working full time approximately 1 year to spend just 12 minutes examining each silver maple. The city forester and the city's expert witness, Dr. Tattar, each testified that the programs suggested by Dr. McNabb were unreasonable and that a 5-year interval between inspections was too long. Dr. McNabb conceded that the cities of Ames, Iowa, and Kansas City, Missouri, do not have hazardous tree inspection programs.

Negligence must be measured against the particular set of facts and circumstances present in each case. *Miles v. School Dist. No. 138*, 204 Neb. 105, 281 N.W.2d 396 (1979). Where the reasonable character of an actor's conduct is in question, its utility is to be weighed against the magnitude of the risk involved. *Anderson v. Davis*, 183 Neb. 326, 160 N.W.2d 94 (1968). In determining whether an action constitutes negligence, the custom of the industry may be considered; however, the custom employed by the industry is not determinative of due care. See *Tite v. Omaha Coliseum Corporation*, 144 Neb. 22, 12 N.W.2d 90 (1943). In that case at 28, 12 N.W.2d at 94, we quoted the rule expressed in *Texas & Pacific Ry. Co. v. Behymer*, 189 U.S. 468, 23 S. Ct. 622, 47 L. Ed. 905 (1903): " 'What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.' "

A program whereby the city would be required to cut down 10,000 or more silver maples, or as much as half of all shade trees in the city, simply because of age would impose a great burden on the city and would deprive the residents of the city of many valued, and healthy, shade trees. We conclude that this is an unreasonable standard and that it would be unreasonable to require the city to conduct lengthy, individual tree inspections.

In *Albin v. National Bk. of Commerce*, 60 Wash. 2d 745, 748-49, 375 P.2d 487, 489 (1962), the court dealt with the issue of prophylactic removal of healthy trees.

It can, of course, be foreseen that trees will fall across tree-lined roads; but short of cutting a swath through wooded areas, having a width on each side of the traveled portion of the road equivalent to the height of the tallest trees adjacent to the highway, we know of no way of safeguarding against the foreseeable danger. At the present time this is neither practicable nor de-

sirable. The financial burden would be unreasonable in comparison with the risk involved.

In *Harris v Vil of East Hills*, 41 N.Y.2d 446, 450, 362 N.E.2d 243, 246, 393 N.Y.S.2d 691, 694 (1977), the court stated: "Under the facts in this case we cannot say that the procedure of inspecting the roadway from the patrol car was unreasonable as a matter of law." In that case the facts disclosed that the county inspected the trees through use of windshield inspections by scheduled police patrols. The jury found such inspection to be reasonable.

In *Warren v. City of Tupelo*, 187 Miss. 816, 194 So. 293 (1940), the court held that there was no duty to have a regular or continued inspection of street trees and that there is no duty to inspect that which presents no visible signs of defects or danger.

In *Commonwealth v. Callebs*, 381 S.W.2d 623 (Ky. App. 1964), the court held that it could not find as a matter of law that the state had a duty to conduct a "walk-around" inspection of trees near the highway.

The plaintiff did not demonstrate that the city was negligent in implementing the program of inspection nor the manner in which it was carried out.

The case turns on the question as to whether the city, through the exercise of reasonable diligence, should have known of the defective condition of the tree. The fact that the tree fell does not, by itself, prove negligence. *Burrows v. Jacobsen*, 209 Neb. 778, 311 N.W.2d 880 (1981).

The Iowa Supreme Court stated in *Pietz v. City of Oskaloosa*, 250 Iowa 374, 379, 92 N.W.2d 577, 580 (1958):

> It cannot be said that trees do not break and fall except when there is negligence upon the part of the one having control thereof. Trees live and grow to considerable height and size and are, year in and year out, naturally exposed to the elements, including winds. Common experience tells us that for a tree to be broken during a storm or high wind is not such an unusual occur-

rence in itself as to raise an inference of lack of due care upon the part of the one having control thereof. It just does not speak for itself, at least to that extent.

It is generally held that the plaintiff must prove that the defendant failed to observe visible signs of decay and that if the defendant had made a careful inspection upon observance of these signs, he should have known that the extent of decay warranted removal of the tree.

In *Carver v. Salt River Valley Water Users' Ass'n*, 104 Ariz. 513, 517, 456 P.2d 371, 375 (1969), the court said:

> There is no testimony that the rot was apparent from the outside or that it was not confined to the internal portion of the trunk. Accordingly, there was no evidence which would support a theory that an inspection would disclose the infirmity and that defendants would have known by the exercise of ordinary care of the rotten condition of the tree.'

In *Branch v. State of New York*, 284 A.D. 825, 132 N.Y.S.2d 409, 410 (1954), it was stated: "It has not been shown that the tree was so weakened that the court was required to find that the State in the exercise of reasonable care should have observed the weakness and removed it."

In *Swope v. City of Wichita*, 141 Kan. 388, 41 P.2d 987 (1935), it was held that negligence could not be found by a jury when, in response to special questions, the jury could not state that a careful inspection would have revealed the actual condition of the tree.

In *Mosher v. State of New York*, 191 Misc. 804, 77 N.Y.S.2d 643 (1948), the court said:

> We have concluded, however, that the statements that it [the limb] was decayed were too broad in the light of evidence. The only observation supporting them was of one hollow spot or hole. This might fairly lead to the conclusion

that there was an area of decay in the limb, but the testimony is vague as to how large an area and as to the progress of the decay. Apparently, it would not have been visible or, at least, noticeable from the ground when the limb was still attached to the tree.

In *Cody v. North Adams*, 265 Mass. 65, 164 N.E. 83 (1928), the court held that it must be shown that the decay was visible before negligence can be found.

In *Warren v. City of Tupelo*, 187 Miss. 816, 194 So. 293 (1940), the court held that a city has no duty to inspect a tree which presents no visible signs of defect. The court stated at 826, 194 So. at 295:

"[I]f the defect or danger be such as not to be observable by those who constantly pass day by day or who for years have lived and labored at the location in question, constructive notice cannot be charged upon the municipality unless the danger was the result of faulty work by the municipality itself. . . ." . . . "No witness saw it [the defect] before the accident, and there was no evidence that any one had seen it, or that any city officer knew of it, or could by reasonable diligence have seen it, before the accident. . . ."

See, also, *Harris v Vil of East Hills*, 41 N.Y.2d 446, 362 N.E.2d 243, 393 N.Y.S.2d 691 (1977); *Berkshire Mut. Fire Ins. Co. v. State of New York*, 9 A.D.2d 555, 189 N.Y.S.2d 333 (1959).

The evidence in the present case shows that the tree was a large silver maple estimated to be between 35 and 100 years old. One witness estimated its diameter at breast height to be about 35 inches. The branch which fell on McGinn's car was about 20 inches in diameter. It is undisputed that at the time of the accident the tree was alive and had leaves. The plaintiff's expert witness characterized it as a "healthy hazard tree." The tree had a V-crotch, and the limb which fell was one side of this V.

The expert witnesses who testified agreed that a

living tree can be a hazardous tree, as decay may render a tree structurally unsound. They also agreed that a hollow tree could be a live tree and structurally sound, depending upon the conditions. Both expert witnesses stated that an inspector must rely upon external indicators when inspecting for decay, as other, more reliable methods for detecting internal decay are semidestructive and impractical. Expert witnesses stated that a tight V-crotch is more likely to present structural problems than one with a wider angle.

The plaintiff's expert witness, Dr. McNabb, testified that he examined the stump of the tree and photographs taken by a newspaper photographer immediately after the tree had fallen. From these sources he stated that there were several external indicators or symptoms of decay. Dr. McNabb testified that, on the photographs, he saw three swollen knots or calluses and a broken branch on the portion of the tree that fell. He testified that his examination of the stump cut close to ground level revealed what he terms an "involution" or the beginning of a cavity. It does not appear that this amounted to an open wound upon the tree.

Dr. McNabb testified that in a study of 845 soft maple trees in Iowa in 1962, 28 percent of the trees in which decay was present had swollen knots. A swollen knot is a place where a branch healed over after the branch fell or was pruned. The size of the knot is an indicator of the length of time that was required for the healing process, during which fungi might become involved in the tree. Dr. McNabb was of the opinion that these factors, when considered together with the species, age, size, and configuration of this tree, warranted its removal. It is apparent from Dr. McNabb's testimony that he considered species and age to be the most important criteria in this determination.

However, Dr. McNabb testified that he would give the tree a rating of three, based upon a scale which

gives a five rating to a solid and sound tree and a one rating to a hollow tree. A rating of three is given where a tree is showing early signs of decay. Dr. McNabb testified that he did not see a "conk" on this particular tree. A conk is a fruiting body of fungi, the presence of which indicates decay.

Dr. McNabb testified that he was aware of the fact that when a tree is injured, decay can enter the tree. He stated that a tree has a mechanism termed compartmentalization, whereby the tree walls off the area of decay and prevents its spread. Dr. McNabb testified that apparently this tree was not successful at compartmentalization.

Vincent Carroll, the owner of the home in front of which the tree was located, testified that he had never seen any cracks, breaks, or holes in the bark of the tree. Carroll testified that following the accident, he arranged for Marshall's Nursery to appraise the tree. The employee of Marshall's Nursery told Carroll that the tree was a good tree. A value of $9,000 was placed on the whole tree; and the loss sustained as a result of the fallen limb was estimated to be $4,600.

The city forester and the assistant city forester testified for the defendant. They listed what they look for when conducting an inspection for hazardous trees. They are: deadwood in the crown, possible cut roots as a result of nearby construction, conks, cankers, oozing sap, trunk damage, splits, and holes or cavities which break to the outside and can be probed. They also look at the number and color of the leaves, the configuration and branching habits, the bark, and the crotch. The city forester testified that swollen knots or calluses did not indicate extensive decay. The city forester stated that the tree appeared, upon an external examination, to be an excellent tree without symptoms which would have required his department to take action. The assistant city forester stated that the tree did not show any external indication of serious internal de-

cay. The assistant city forester testified that the swollen knots were not an indication of serious decay because a tree usually compartmentalizes and thus limits the area of decay.

Dr. Tattar, the plant pathologist from the University of Massachusetts who testified for the defendant, also examined the photographs of the tree and stump. He testified that there was nothing indicative in the calluses or swollen knots on this tree which would lead him to suspect that the tree had an internal condition that would constitute a safety hazard. Dr. Tattar stated that the tree had an encased bark and that the stump showed no opening to the heartwood. Dr. Tattar stated that age, species, size, and configuration, whether considered alone or together, are not a sufficient basis to determine that a tree should be removed. Dr. Tattar stated that an investigator should look at the foliage, the bark, and the roots. He testified that an inspector should look for the presence of a conk or fungus structure and the oozing of any type of product. Dr. Tattar testified that, based upon the external indications, he would not call this a living hazardous tree.

It is undisputed that the tree was the subject of annual windshield inspections, and the evidence indicates the tree was walked around as part of the 1979 census. There was no indication that the tree was found to be hazardous as a result of any inspection made by the city.

From our review of the evidence we conclude that the plaintiff did not prove that the city failed to inspect the tree and that the city failed to observe visible signs of substantial decay and that the city failed to conduct a reasonable investigation prompted by the presence of indications of decay which would have revealed the extent of the decay.

The testimony does not show that the indicators of decay as testified to by Dr. McNabb were readily visible from an on-street inspection. Carroll, the owner of the home in front of which the tree was lo-

cated, never saw any indication of decay. Except for his investigation of the stump, Dr. McNabb's impressions of the tree were based upon black and white photographs taken after the tree had fallen.

Dr. McNabb testified that an external examination of the tree would reveal signs of early decay. No other conclusion can be drawn from the evidence but that the external symptoms did not reveal the extent of decay present and that a careful examination would not indicate the extent of the decay. There is no testimony in the record which would support a finding that a reasonable investigation would have revealed the extent of the decay present in the tree. All of the expert witnesses agreed that means of external investigation other than visual examination were destructive and/or impractical.

Dr. McNabb's testimony that the tree was dangerous was based primarily upon his opinion that once a tree reaches a certain age and height, statistics, the probabilities of which he did not reveal, warranted removal. The city forester, the assistant city forester, and Dr. Tattar testified that removal based upon such statistics is unreasonable, as it serves to deprive the residents of the city of more healthy shade trees than the risk warrants. The cost of removal and replacement would be extremely burdensome. We conclude that such prophylactic removal is unreasonable, and testimony that this tree was dangerous based upon such conditions cannot support a finding of negligence.

While we conclude that the plaintiff did not sustain his burden of proof on the issue of negligence, we note that when a tree falls in weather conditions similar to those in the present case, some courts impose a higher burden of proof upon the plaintiff. In *Turner v. City of Wichita*, 143 Kan. 808, 809, 57 P.2d 79, 80 (1936), it was stated:

> "In case a high and more or less unusual wind is blowing, and it need not be a tornado, nor even of unprecedented velocity, and it is obvious

to a person of ordinary intelligence traveling upon the street that limbs and branches, either decayed, rotted or living, from trees standing in the highway, may be thrown down, there is no libability [sic], unless the condition of the tree or the limbs or branches thereof is so patently bad and has existed for such length of time that permitting them to remain is equivalent to an utter disregard of the safety of the traveler in the street.''

The evidence shows that the storm of June 12, 1980, was a severe one. A meteorologist estimated that the winds at the site of the accident at the time it occurred were between 75 and 100 miles per hour. The meteorologist stated that except for the 1975 Omaha tornado, this was the second worst storm in the area in a 26-year period. Vincent Carroll stated that the storm was one of the most intense that he could remember. He stated he could not remember winds of that intensity. After the storm Carroll went about the neighborhood and took pictures of various trees which had been broken or uprooted by the storm. Carroll testified that another tree just north of his property had been broken in the storm.

The plaintiff did not demonstrate that the condition of the limb was so patently bad and had existed for so long a period of time as to warrant a finding that the city acted with utter disregard for his safety.

In *Pietz v. City of Oskaloosa*, 250 Iowa 374, 92 N.W.2d 577 (1958), the factual situation was similar to that presented herein. In denying liability the court said at 377-78, 92 N.W.2d at 579:

The tree in question, an ash, was located in the park some twenty-five feet west of where the car was parked. It was some two feet in diameter at the butt and about fifty feet in height. All parties are agreed that it was a live tree and, on the day in question, an unusually strong wind was blowing. There is testimony of gusts up to

sixty-five miles per hour. The entire top of the tree broke off at a place some twenty-eight feet above the ground, splitting the trunk down some fifteen feet before it broke clear. There is a dispute in the record as to whether or not the break was at a fork in the tree, but it is clear that after the break no limbs or branches remained on the stump left standing. While it is disputed, there is testimony, based upon an examination of the broken part of the tree, that it was decayed at the place of the break and was deteriorated. There is not however a word of testimony that prior to the break this tree in any way appeared, or was thought to be, decayed or unsafe. It also appears in the record that in October or November 1955 a competent firm of tree repairmen, employed by the City, inspected the trees in the park including the one in question, which was found and reported to be in good condition.

Viewing this record in the light most favorable to appellant we are unable to find even a scintilla of evidence tending to show a breach of duty upon the part of defendants as is charged in Count I of the petition.

We think the following statements from *Roos v. Consumers Public Power Dist.*, 171 Neb. 563, 571-72, 106 N.W.2d 871, 876-77 (1961), have some application here:

A failure to anticipate and guard against a happening which would not have arisen except under exceptional or unusual circumstances is not negligence. Frerichs v. Eastern Nebraska Public Power Dist., 154 Neb. 777, 49 N.W.2d 619. "The law does not require impossibilities of such companies in avoiding accidents and resulting injuries. In the erection and maintenance of their poles, wires, and other appliances, they are bound to anticipate only such combinations of circumstances and accidents and injuries therefrom as they may reasonably forecast as

likely to happen, taking into account their own past experience and the experience and practice of others in similar situations, together with what is inherently probable from the condition of their appliances as they relate to the conduct of their business." 18 Am. Jur., Electricity, § 53, p. 448.

. . . .

We point out also that there is no evidence that the defendant had any reasonable or practical means of locating the defective place in the line prior to its break, or that it had any knowledge of the defect. It is not shown that any special equipment existed that is of general use in the trade, which would have revealed the defect, the nonuse of which would amount to a failure to properly maintain the line in the exercise of due care.

It is unnecessary to consider the other assignments of error.

The judgment is reversed and the cause remanded with directions to dismiss the petition.

REVERSED AND REMANDED WITH DIRECTIONS.

SHANAHAN, J., dissenting.

The majority opinion paints a picture in hues of a herculean task involving the city's trees. However, the crux of this case is not inspection of 10,000 silver maples, but the city's inspection of just one tree.

The majority opinion is predicated on two premises: (1) There is no evidence that the city was negligent regarding inspection of trees; and (2) It is unreasonable to require the city to conduct lengthy, individual tree inspections.

As roots for its opinion, the majority states: "The assistant city forester stated that the tree did not show any external indication of serious internal decay"; "The testimony does not show that the indicators of decay as testified to by Dr. McNabb were readily visible from an on-street inspection"; and "There is no testimony in the record which would

support a finding that a reasonable investigation would have revealed the extent of the decay present in the tree.''

If that were the extent of the record, one might wonder how the district court ever found the city negligent.

Without objection from the city, McGinn's expert, Dr. McNabb, expressed his opinion that the tree in question manifested signs or symptoms observable to the trained eye of a city forester, namely, signs or symptoms indicating an advanced state of decay within the tree in question. Dr. McNabb further testified about several other important factors. Signs or symptoms of advanced decay in the tree were manifested at least 5 to 10 years before the accident. A thorough inspection of the 85-year-old tree would have taken between 15 minutes and ½ hour. Indication of the advanced state of decay in the tree, ''heartrot,'' was apparent to the ''naked eye'' of any tree inspector.

The city had an ''ongoing'' inspection of trees to determine which trees should be removed. If inspection disclosed external evidence of a tree's rotten interior, steps were taken to ascertain the extent of interior decay and determine whether the decayed condition warranted immediate or deferred removal of the tree. In September 1979, approximately 10 months before the accident, the assistant city forester inspected the tree in question. As reflected in the majority opinion, to the city employees ''the tree appeared . . . to be an excellent tree without symptoms which would have required'' the city to take any further action. However, as testified by Dr. McNabb, the telltale indicators were readily observable when the tree was ''walked around'' and inspected by the city's forester in the fall of 1979. The city's tree expert testified that examination after the accident revealed ''approximately half the volume of the tree'' appeared to be decayed and ''fifty percent of the total volume [of the tree]'' was gone. In

such state the evidence presented a question of fact about the presence or absence of care regarding the city's inspection of the tree which crushed McGinn.

After receiving evidence that there was a manifest indication of rot or decay in the tree, the trial court made a specific finding:

> The testimony revealed that the inspection of late 1979 (with none in 1980 prior to the accident) was part of a tree-census taking by the regular personnel of the Forestry Division and some temporary help. It was a rather cursory inspection as far as attempting to fulfill the City's obligation toward maintaining its trees in a safe condition. There is no evidence that a proper inspection was made.

Thus, the trial court found the city failed to use reasonable care in inspecting the tree and such failure was the proximate cause of McGinn's injury.

Any problematical question about the city's duty in formulating an inspection program became irrelevant when the city actually undertook an inspection of the particular tree in this case and failed to see the readily observable and manifest signs of advanced decay in the tree. When one under no obligation to act does undertake action, one must act with reasonable care. The preceding principle is not novel, and is based on law much older than the tree which fell on McGinn. " 'If a party undertake[s] to perform work, and proceed[s] on the employment, he makes himself liable for any misfeasance in the course of that work . . . .' " See *Hart v. Ludwig*, 347 Mich. 559, 562, 79 N.W.2d 895, 896-97 (1956), citing and quoting from *Elsee v. Gatward*, 5 Durnform & East's 143, 101 Eng. Rep. 82 (1793).

The oft-quoted rule was aptly and simply expressed by Judge Benjamin Cardozo in *Glanzer v. Shepard*, 233 N.Y. 236, 239-40, 135 N.E. 275, 276 (1922):

> It is ancient learning that one who assumes to

act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all (*Coggs* v. *Bernard*, 2 Ld. Raymond, 909; *Shiells* v. *Blackburne*, 1 H. Bl. 158; Willes, J., in *Skelton* v. *L. & N. W. Ry. Co.*, L. R. 2 C. P. 631, 636; Kent, Ch. J., in *Thorne* v. *Deas*, 4 Johns. 84, 96).

Judge Cardozo later paraphrased the rule in *Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 167, 159 N.E. 896, 898 (1928): "The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all." A governmental or political subdivision as well as a private individual must act with reasonable care in reference to action undertaken without an obligation to act. See *Barnum v. Rural Fire Protection Company*, 24 Ariz. App. 233, 537 P.2d 618 (1975); accord *Wolf v. City of New York*, 39 N.Y.2d 568, 349 N.E.2d 858, 384 N.Y.S.2d 758 (1976). See, also, *Wulf v. Rebbun*, 25 Wis. 2d 499, 131 N.W.2d 303 (1964). The very word *inspection* used by the city to describe its actions required the city to see the manifest and externally observable signs or symptoms of advanced decay in the tree—a situation which called for further protective measures by the city, including possible removal of the tree. To fail to see the obvious in plain view constituted a breach of the duty undertaken by the city.

When the city's employee inspected the tree, there was clearly observable and external evidence of advanced decay within the tree. The exact extent of the tree's interior decay before the accident was never actually known to the city only because the city did not see what was in plain sight and there to be seen. Failure to observe what was in plain view prevents the city's inspection from being characterized as even remotely reasonable. There was evidence before the trial court that the city had constructive knowledge of the tree's interior decay.

[The Political Subdivisions Tort Claims Act]

[s]ection 23-2406, R.R.S. 1943, requires that actions of this nature shall be heard without a jury but otherwise determined in the same manner as other suits. The action is similar to a law action in which a jury has been waived and is governed by the same rules.

"It is not within the province of this court in a law action to resolve conflicts in or to weigh evidence. If there is a conflict in the evidence, this court will review the judgment rendered, will presume that controverted facts were decided by the trial court in favor of the successful party, and the findings will not be disturbed unless clearly wrong. * * *

"The findings of the court in a law action in which a jury is waived have the effect of a verdict of the jury and will not be disturbed on appeal unless clearly wrong."

*Buttner v. Omaha P. P. Dist.*, 193 Neb. 515, 517-18, 227 N.W.2d 862, 864 (1975).

"In determining the sufficiency of the evidence to sustain a judgment, it must be considered in the light most favorable to the successful party. Every controverted fact must be resolved in his favor and he is entitled to the benefit of every inference that can reasonably be deduced from the evidence." [Citations omitted.] Moreover, under the Political Subdivisions Tort Claims Act, section 23-2406, R.R.S. 1943, the "findings of a District Court under the act will not be disturbed on appeal unless they are clearly wrong." [Citation omitted.]

*Daniels v. Andersen*, 195 Neb. 95, 98, 237 N.W.2d 397, 400 (1975).

The disturbing features of the majority opinion culminate in the quiet alteration of our standard of review in cases under the Political Subdivisions Tort Claims Act. The majority neither suggests nor concludes Dr. McNabb's testimony was incredible. Consequently, Dr. McNabb's opinion was credible

evidence before the trier of fact. The majority provides no standard or reason for appellate annulment of evidence and findings of the trial court, but ignores or disregards the evidence before the trial court. As a result of the majority opinion, our review of governmental tort claims is transformed to de novo on the record, that is, under the Political Subdivisions Tort Claims Act we now substitute our judgment for that of the trial court and make an independent determination of facts apart from the findings made by the trial court. Even in a de novo review of the record, where there is a conflict on a material issue of fact, we give consideration to a judge's observation of witnesses in the trial court's accepting one version of facts over another.

In the present case there is evidence to support the trial court's findings, and those findings are not clearly wrong. The judgment of the trial court should have been affirmed.

KRIVOSHA, C.J., and WHITE, J., join in this dissent.