**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JONATHAN MICHAEL CASTRO,
*Plaintiff-Appellee*,

v.

COUNTY OF LOS ANGELES; LOS
ANGELES SHERIFF'S DEPARTMENT;
CHRISTOPHER SOLOMON; DAVID
VALENTINE, Sergeant, aka
Valentine,
*Defendants-Appellants*.

No. 12-56829

D.C. No.
2:10-05425-DSF

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
December 11, 2014—Pasadena, California

Filed August 11, 2015

Before: Ronald Lee Gilman,* Susan P. Graber,
and Consuelo M. Callahan, Circuit Judges.

Order;

---

* The Honorable Ronald Lee Gilman, Senior United States Circuit Judge
for the Sixth Circuit, sitting by designation.

Opinion by Judge Gilman;
Concurrence by Judge Callahan;
Partial Concurrence and Partial Dissent by Judge Graber

## SUMMARY[**]

### Civil Rights

The panel withdrew its prior opinion, concurrence, and partial concurrence and partial dissent, filed May 1, 2015, and published at 785 F.3d 336, and replaced it with an amended opinion, concurrence and partial concurrence and partial dissent.

The panel affirmed in part and reversed in part the district court's judgment, entered following a jury trial, in an action brought under federal and state law by a pretrial detainee who was attacked by another arrestee and suffered serious harm. Plaintiff alleged that the County of Los Angeles, the Los Angeles Sheriff's Department County and individual defendants were deliberately indifferent to the substantial risk of harm created by housing him in the same sobering cell as the other arrestee and by failing to maintain appropriate supervision of the cell.

Affirming the judgment in favor of plaintiff against the individual defendants, the panel held that defendants were not entitled to qualified immunity because the right to be free from violence at the hands of other inmates was well

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

established and there was sufficient evidence for a jury to find that the officials were deliberately indifferent to a substantial risk of harm to plaintiff. The panel further found that there was sufficient evidence for the punitive damages award.

Reversing the judgment in favor of plaintiff against the entity defendants, the panel held that plaintiff's claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–71 (1978), was legally viable but insufficiently proven. The panel held that although the entity defendants instituted a formal policy under *Monell* with regard to designing the jail's sobering cell, there was insufficient that defendants had actual knowledge of a risk to plaintiff's safety. The panel stated that even though a state regulation required Counties to install a compliant audio-monitoring system to ensure that inmates could easily summon help, there was no evidence presented at trial that the entity defendants had actual, rather than constructive, knowledge of the regulation.

The panel affirmed the jury's future-damages award, determining that plaintiff presented sufficient evidence regarding the amount of his past damages from which a jury could reasonably calculate the amount of future damages.

Concurring, Judge Callahan agreed that the judgment of the district court against the individual defendants should be affirmed and the judgment against the entity defendants should be reversed. She wrote separately to explain that she did not think that plaintiff had shown that the design of the West Hollywood Station constituted a policy for purposes of liability under *Monell*.

Concurring in part and dissenting in part, Judge Graber joined the majority opinion as to the liability of the individual

defendants. She dissented from the holding that there was insufficient evidence from which the jury could have concluded that the entity defendants were deliberately indifferent to the risk that plaintiff would be harmed by a fellow inmate. Judge Graber also wrote separately because, in her view, the Supreme Court's recent decision in *Kingsley V. Hendrickson*, 135 S. Ct. 2466 (2015), called into question the Circuit's precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees.

## COUNSEL

Melinda Cantrall (argued) and Thomas C. Hurrell, Hurrell Cantrall LLP, Los Angeles, California, for Defendants-Appellants.

John Burton (argued), Law Offices of John Burton, Pasadena, California; Maria Cavalluzzi, Cavalluzzi & Cavalluzzi, Los Angeles, California; and Lawrence Lallande, Lallande Law PLC, Long Beach, California, for Plaintiff-Appellee.

## ORDER

The opinion, concurrence, and partial concurrence and partial dissent filed May 1, 2015, and published at 785 F.3d 336, are withdrawn and are replaced by the opinion, concurrence, and partial concurrence and partial dissent filed concurrently with this order. As the court's opinion is withdrawn, Appellants' petition for panel rehearing and petition for rehearing en banc is moot. Further petitions for panel rehearing and for rehearing en banc may be filed.

## OPINION

GILMAN, Senior Circuit Judge:

In October 2009, Jonathan Castro was arrested for being drunk in public. He was housed in a "sobering cell" at the Los Angeles Sheriff's West Hollywood Station where, a few hours after his arrest, he was savagely attacked by another intoxicated arrestee who had been placed in the cell with him. The officer on duty at the jail failed to respond to Castro's pounding on the cell door despite evidence that the officer was well within range to hear the pounding. Castro suffered serious harm, including a broken jaw and traumatic brain injury.

This lawsuit was filed by Castro in the United States District Court for the Central District of California in July 2010. He brought both federal- and state-law claims against the County of Los Angeles, the Los Angeles County Sheriff's Department, and a number of John Doe defendants who were later identified as two of his jailers. After a six-day trial, the

jury returned a verdict for Castro against both the individual and entity defendants, awarding him over $2.6 million in past and future damages.

The defendants then renewed their joint motion for judgment as a matter of law, arguing that there was insufficient evidence to support the verdict, that the individual defendants were entitled to qualified immunity, and that Castro's theory of liability against the County and the Sheriff's Department (these two entities being hereinafter collectively referred to as the County) was simply untenable. The district court denied the defendants' motion without a written opinion. They now appeal. For the reasons set forth below, we **AFFIRM** the judgment of the district court against the individual defendants but **REVERSE** the judgment against the County.

## I. BACKGROUND

### A. Assault on Castro

Castro was arrested late in the evening of October 2, 2009 for public drunkenness. The arresting officers reported that Castro was staggering, bumping into pedestrians, and speaking unintelligibly, so they arrested him "for his safety." He was transported to the West Hollywood Station and placed in a fully walled sobering cell that was stripped of objects with hard edges on which an inmate could hurt himself if he lost his balance. The cell contained only a toilet and a series of mattress pads on the floor. A short time later, Jonathan Gonzalez was arrested after punching out a window at a nightclub. The officers brought Gonzalez to the West Hollywood Station, where he was placed in the same sobering

cell that housed Castro. Gonzalez's intake forms indicated that he was "combative" at the time he was placed in the cell.

Shortly after Gonzalez was placed in the cell, Castro approached the door and pounded on the window in the door for a full minute, attempting to attract an officer's attention. No one responded. A community volunteer at the jail, Gene Schiff, came by approximately 20 minutes later. He noted that Castro appeared to be asleep and that Gonzalez was "inappropriately" touching Castro's thigh, the latter circumstance being in violation of jail policy. Schiff did not enter the cell to investigate. Instead, he reported the contact to the supervising officer, Christopher Solomon. Solomon took no action until he heard loud sounds six minutes later. He rushed to the sobering cell and saw Gonzalez making a violent stomping motion. Solomon immediately opened the door and discovered that Gonzalez was stomping on Castro's head. Solomon ordered Gonzalez to step away from Castro. Seeing that Castro was by then lying unconscious in a pool of blood, Solomon called for medical assistance.

When the paramedics arrived, Castro was still unconscious, in respiratory distress, and turning blue. He was hospitalized for almost a month, then transferred to a long-term care facility, where he remained for four years. He currently suffers from severe memory loss and permanent cognitive impairments. Even after his release from the long-term care facility, Castro remains incapable of performing simple life functions, such as cooking and maintaining hygiene. His family is responsible for his basic care to this day.

**B.  District court proceedings**

After his complaint was filed, Castro substituted Solomon and Solomon's supervisor, Sergeant David Valentine, for the John Doe defendants named in the original complaint. Solomon was the jail's officer on duty on the evening in question and Valentine was the watch sergeant in charge of the jail as a whole. Castro's basic theory of liability under 42 U.S.C. § 1983 was that both the County and the individual defendants were deliberately indifferent to the substantial risk of harm created by housing him in the same sobering cell as Gonzalez and by failing to maintain appropriate supervision of the cell.  The complaint also set forth a variety of state-law claims, not one of which is raised by any party to this appeal.

The individual defendants moved to dismiss the claims against them on the ground of qualified immunity, but the district court rejected their arguments.  It concluded that a jury could find that placing an actively belligerent inmate in an unmonitored cell with Castro constituted deliberate indifference to a substantial risk of harm, in violation of Castro's constitutional rights.

The case proceeded to trial.  After Castro rested his case, the defendants moved for judgment as a matter of law on three grounds: (1) insufficient evidence that the design of a jail cell constitutes a policy, practice, or custom by the County that resulted in a constitutional violation; (2) insufficient evidence that a reasonable officer would have known that housing Castro and Gonzalez together was a violation of Castro's constitutional rights; and (3) insufficient evidence for the jury to award punitive damages.  The district court denied the motion in its entirety.  Five days later, the jury returned a verdict for Castro on all counts and awarded

him $2,605,632.02 in damages.  Based on the jury's findings, the parties later stipulated to $840,000 in attorney fees, $12,000 in punitive damages against Valentine, and $6,000 in punitive damages against Solomon.

After trial, the defendants timely filed a renewed motion for judgment as a matter of law.  The trial court denied the renewed motion without issuing a written opinion.  This timely appeal followed.

## II.  ANALYSIS

### A.  Standard of review

We review de novo the district court's denial of a motion for judgment as a matter of law.  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1005 (9th Cir. 2004). A renewed motion for judgment as a matter of law is properly granted only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Id.*

In making this determination, the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227–28 (9th Cir. 2001).  Although the court must review the entire evidentiary record, it must view all the evidence in the light most favorable to the nonmoving party, draw all

reasonable inferences in the favor of the nonmover, and disregard all evidence favorable to the moving party that the jury is not required to believe.  *Id*. at 1227.

The defendants raise a number of issues on appeal, ranging from discrete legal questions to disputed matters of evidence.  We first address the arguments raised by the individual defendants,  then move  on to those presented by the County.

## B.  Neither Solomon nor Valentine is entitled to qualified immunity

Both individual defendants—Solomon and Valentine— argue  that the judgment against them should be reversed because they are entitled to qualified immunity.  The doctrine of qualified immunity shields government officials from civil liability under 42 U.S.C. § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent prongs: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident.  *Id.* at 232.  These prongs may be addressed in either order. *Id.* at 236.

The constitutional right at issue in this case is the right to be free from violence at the hands of other inmates. This right was first recognized by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994). In *Farmer*, a male-to-female transgender person was placed in male housing in the federal prison system, where she was beaten and raped by another inmate. *Id.* at 830. She brought a civil rights action for damages and an injunction, alleging that the corrections officers had acted with deliberate indifference to her safety, in violation of the Eighth Amendment. *Id.* at 830–31. The Supreme Court agreed with her, holding that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners" because corrections officers have "stripped [the inmates] of virtually every means of self-protection and foreclosed their access to outside aid." *Id*. at 833 (internal quotation marks omitted). This court has since clarified that the right to be free from violence at the hands of other inmates extends to inmates housed in state or local custody. *See Cortez v. Skol*, 776 F.3d 1046, 1049–50 (9th Cir. 2015) (recognizing a claim based on *Farmer* brought by a state prisoner).

Both Solomon and Valentine acknowledge that the duty to protect Castro from violence was clearly established at the time of the incident. But they argue that such a broad definition of that duty is too general to guide this court's analysis. Moreover, they contend that Castro failed to present substantial evidence to establish that they violated their duty to protect him.

"To determine that the law was clearly established, we need not look to a case with identical or even 'materially similar' facts." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739–41

(2002)).  The question instead is whether the contours of the right were sufficiently clear that a reasonable official would understand that his actions violated that right. *Id.*; *see also Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Following the Supreme Court's 1994 decision in *Farmer*, this court has considered over 15 different failure-to-protect claims stemming from inmate-on-inmate violence.  In each case, the court has recited the standard established by *Farmer*, then proceeded to apply that standard to the facts of the case before the court. The similarity of the facts—or the lack thereof—to other post-*Farmer* cases has rarely entered the discussion. *See, e.g.*, *Robinson v. Prunty*, 249 F.3d 862, 866–67 (9th Cir. 2001).

Instead, the right at issue is construed simply as the right to be protected from attacks by other inmates.  This is in stark contrast with the qualified-immunity analysis for other types of claims, such as excessive force, in which analogies to prior cases play a much stronger role. *See Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1082–83 (9th Cir. 2013); *Winterrowd v. Nelson*, 480 F.3d 1181, 1185–86 (9th Cir. 2007); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056–61 (9th Cir. 2003).  In sum, *Farmer* sets forth the contours of the right to be free from violence at the hands of other inmates with sufficient clarity to guide a reasonable officer.  Solomon and Valentine's argument on this point is therefore without merit.

They next question the sufficiency of the evidence supporting Castro's claim of deliberate indifference. Because Castro was a pretrial detainee, his right to be free from violence at the hands of other inmates arises from the Fourteenth Amendment rather than the Eighth Amendment.

*See Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002). Despite those different constitutional sources, the "deliberate indifference" test is the same for pretrial detainees and for convicted prisoners. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010) (explaining that "neither [the Ninth Circuit] nor the Supreme Court ha[s] departed from the standard set forth in *Bell* and *Farmer* for considering pretrial detainees' claims that government officials violated their Fourteenth Amendment rights by failing to prevent harm").

Our dissenting colleague, however, believes that the Supreme Court's recent decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), calls the law on this point into question. She argues that "*Kingsley* undermines *Clouthier*" because the Fourteenth Amendment provides substantively different protections than the Eighth Amendment, such that different standards may now apply to claims brought by pretrial detainees as opposed to convicted prisoners. Dissenting Op. at 43–46.

We find at least two flaws in the dissent's analysis. First and foremost, *Kingsley* itself acknowledges that it does not necessarily impose different standards for claims brought under the Eighth Amendment as opposed to the Fourteenth Amendment; it addresses only the rights of pretrial detainees under the Fourteenth Amendment without passing judgment on parallel rights that may be possessed by convicted prisoners under the Eighth Amendment. *See Kingsley*, 135 S. Ct. at 2476 ("We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims

brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today."). For this same reason, we disagree with our dissenting colleague's view that *Clouthier*'s reading of *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), "cannot survive *Kingsley*." Dissenting Op. at 46.

Second, even if *Kingsley* did establish different standards for excessive-force claims brought by pretrial detainees as opposed to convicted prisoners, such a holding would have no bearing on the failure-to-protect claims presented here and in *Clouthier*. The dissent acknowledges that "[t]here are important differences between excessive force and failure-to-protect claims," but nonetheless believes that the fact that they are drawn from the same constitutional sources—the Eighth and Fourteenth Amendments—is sufficient to overcome those differences. Dissenting Op. at 45. We respectfully disagree.

The standard for a failure-to-protect claim—deliberate indifference to a substantial risk of serious harm—is completely different from the standard for an excessive-force claim. For years, the Supreme Court has held that the focus of any excessive-force claim, whether brought under the Eighth Amendment or the Fourteenth Amendment, is on the reasonableness of an officer's actions rather than on whatever thoughts, knowledge, or motivation may have driven those actions. *See Graham v. Connor*, 490 U.S. 386, 397 (1989) (holding that "the question [in an excessive-force claim] is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation," such that "[a]n officer's evil intentions will not make a [constitutional] violation out of an objectively reasonable use of force; nor

will an officer's good intentions make an objectively unreasonable use of force constitutional.").

Failure-to-protect claims, however, involve no affirmative act at all by the defendant. The Supreme Court thus requires lower courts to consider more than just the simple fact of inaction; we must also assess what was going on inside the defendant's mind that led to his failure to act. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding that in order for a defendant to be deemed "deliberately indifferent" to a particular risk, he "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). We believe that this substantive difference is more significant than the common constitutional source.

In short, *Kingsley* does not establish that excessive-force claims brought under the Fourteenth Amendment are governed by a different standard than excessive-force claims brought under the Eighth Amendment. And even if it did, as the dissent acknowledges, we would not be authorized to extend that distinction to the substantively different failure-to-protect claim presented both here and in *Clouthier* without express instructions from the Supreme Court to do so. *See Agostini v. Felton*, 521 U.S. 203, 207 (1997) ("The Court neither acknowledges nor holds that other courts should ever conclude that its more recent cases have, by implication, overruled an earlier precedent. Rather, lower courts should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Accepting, then, that *Clouthier* remains good law, Castro was required to show by a preponderance of the evidence that (1) he faced a substantial risk of serious harm, (2) the

defendants were deliberately indifferent to that risk, and (3) the defendants' failure to act was a proximate cause of the harm that he suffered. *See Farmer*, 511 U.S. at 847. A defendant is deemed "deliberately indifferent" to a substantial risk of serious harm when he knew of the risk but disregarded it by failing to take reasonable measures to address the danger. *Id.*

In the case before us, the jury specifically found on the verdict form that both Solomon and Valentine were deliberately indifferent to Castro's plight. In his brief on appeal, Castro notes several different ways in which Solomon and Valentine were deliberately indifferent to his risk of harm: both decided to house him in a fully walled sobering cell with a "combative" inmate; Solomon failed to respond to Castro's banging on the window in the door of the cell; Solomon failed to respond fast enough to Gonzalez's inappropriate touching; and Solomon erred in delegating the safety checks to a volunteer. We conclude that the jury could have found Solomon and Valentine liable based on the substantial evidence presented in support of one or more of these theories.

### 1. The jury could have found that Solomon was deliberately indifferent to a substantial risk of harm to Castro because he disregarded Castro's pounding on the cell door

Castro's most persuasive theory of deliberate indifference with respect to Solomon stems from Solomon's failure to respond when Castro pounded on the door after Gonzalez was placed in the cell. Video footage presented at trial established that Castro pounded on the door for a full minute after Gonzalez entered the cell. Solomon was near the cell at the

time, but testified that he did not hear the pounding. Solomon also contends that the video footage of the event shows that he "did not appear to hear any banging on the door by plaintiff." Three other witnesses, however, including two jail employees, testified that one could hear simple talking from inside the sobering cell, such that pounding would have been easy to hear from where Solomon was standing.

Faced with this evidence, the jury could have reasonably concluded that Solomon heard the pounding and elected not to respond. "[A] jury may properly refuse to credit even uncontradicted testimony." *Guy v. City of San Diego*, 608 F.3d 582, 588 (9th Cir. 2010) (citing *Quock Ting v. United States*, 140 U.S. 417, 420–21 (1891)). Here, the jury was presented with circumstantial evidence that undermined Solomon's assertion that he did not hear the pounding.

But Solomon contends in his brief that we are free to "disregard inferences in favor of the prevailing party where they are belied by a video account in the record," citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). In this case, however, the video footage neither confirms nor refutes Solomon's account. The jury had the opportunity to review both the footage and the testimony in context, and to perform a full assessment of each witness's credibility. Given the testimony of three other witnesses, the jury had sufficient evidence to conclude that Solomon heard but ignored Castro's attempts to attract attention. On appeal, we "may not substitute [our] view of the evidence for that of the jury." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001).

We thus reach the question of whether Solomon's failure to respond to Castro's banging constituted deliberate

indifference. The jury determined that it did. This court has long held that whether or not a prison official's actions constitute deliberate indifference is a subjective inquiry and a question of fact. *Grenning v. Miller-Stout*, 739 F.3d 1235, 1239 (9th Cir. 2014) (citing *Johnson v. Lewis*, 217 F.3d 726, 734 (9th Cir. 2000)). Because questions of fact are uniquely the province of the jury, *see Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002), its determination must stand when supported by substantial evidence, *see Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

This leads to the issue of whether Solomon's deliberate indifference was both an actual and a proximate cause of Castro's harm. *See Lemire v. Cal. Dep't of Corr. & Rehab*., 726 F.3d 1062, 1074 (9th Cir. 2013) (holding that "plaintiffs alleging deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries"). Actual causation is "purely a question of fact," *Robinson v. York*, 566 F.3d 817, 825 (9th Cir. 2009), and the jury determined that Solomon's deliberate indifference was in fact one of the causes of Castro's harm.

But Solomon argues that this finding is unsupported by the evidence because Castro did not appear to be injured during a safety check performed 22 minutes after the pounding stopped. His proposed restriction on the relevant timeline for causation, however, does not comport with this court's prior rulings. *See, e.g.*, *Conn v. City of Reno*, 591 F.3d 1081, 1098–1101 (9th Cir. 2010)) (holding that a corrections officer's failure to respond to warnings of harm could be an actual cause of that inmate's suicide 48 hours later), *vacated*, 131 S. Ct. 1812 (2011), *reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011). Because Solomon has presented no compelling reason to adopt his proposed

arbitrary time limitation, we decline to do so. The jury's verdict on actual causation is supported by sufficient evidence to remain undisturbed.

"'Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury, there remains the question whether the defendant should be legally responsible for the injury.'" *Id.* at 1100 (quoting *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990)). A corrections officer will be held legally responsible for an inmate's injuries if the officer's actions are a "moving force" behind a series of events that ultimately lead to a foreseeable harm, even if other intervening causes contributed to the harm. *Id.* at 1101. If reasonable persons could differ over the question of foreseeability, that issue should be left to the jury. *Id.*

This court's prior cases are instructive. In *Conn*, for example, this court found that a corrections officer's failure to respond to an inmate's attempt to choke herself and to her subsequent threats of suicide could be considered a proximate cause of her suicide two days after the threats, even though she was subjected to several medical examinations between the time of the threats and the time of her death. *Id.* at 1101–02. The question of foreseeability was left to the jury. *Id.* Similarly, the court in *White* concluded that a corrections officer's decision to forcibly place an inmate (the plaintiff) into a cell with another, violent inmate could be considered a "moving force" behind the injury that the plaintiff suffered when he attempted to run, such that the question should have been sent to a jury. *White*, 901 F.2d. at 1506. Here, the jury found that Solomon's deliberate indifference was one of the causes of Castro's harm. Leaving that decision to the jury is in concert with this court's prior opinions.

*Farmer* clearly established that a corrections officer has a duty to act to protect one inmate from violence at the hands of another. The jury was presented with sufficient evidence to find that Solomon was aware of but disregarded Castro's attempts to alert Solomon to the danger faced by Castro. And the jury determined that Solomon's deliberate indifference was both an actual and a proximate cause of Castro's harm. Even if we might have reached a different conclusion when considering the totality of the circumstances, there is sufficient evidence to support the jury's verdict on this issue.

### 2. *The jury could have found that Valentine was deliberately indifferent to a substantial risk of harm to Castro when he placed Gonzalez in Castro's cell*

We next turn to Sergeant Valentine. The parties agree that Valentine may be held liable only for his own actions. Vicarious liability does not apply to claims brought under § 1983, so Valentine may not be held independently responsible for the actions of his subordinates. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Valentine was not in the immediate vicinity of the sobering cell for most of the events at issue in this case. The only relevant event for which he was present was the initial decision to house Gonzalez in the sobering cell with Castro, so we will focus our analysis on that decision.

Valentine argues that he is entitled to qualified immunity because a reasonable officer at the time of the incident would not have known that housing Gonzalez in the same cell as Castro would violate Castro's constitutional rights. He relies heavily on *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002), to support this argument. In *Ford*, a group of prison officials decided to house the plaintiff with another

inmate who had been classified as a "predator" after several past incidents of assault on his cellmates. *Id.* at 1046–47. Two days later, the "predator" inmate attacked and killed the plaintiff. *Id.* at 1047.

The predatory inmate in *Ford*, however, "had been successfully double-celled for years with other inmates" and had not been recommended for "single-celling" by the prison staff. *Id.* at 1051. Moreover, the plaintiff and the predator in *Ford* consented to be housed together. *Id.* at 1047. They had previously been housed together without incident, and there was no history of violence between them. *Id.* Based on that history, this court found that "it would not be clear to a reasonable prison official when the risk of harm from double-celling . . . changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm." *Id.* at 1051. (emphases in original). The court therefore held that the official was entitled to qualified immunity. *Id.* at 1053.

*Ford*'s central holding is that an officer is entitled to qualified immunity when the transition from *a* risk of *some* harm to a *substantial* risk of *serious* harm would not have been clear to a reasonable prison official. "[T]he qualitative difference between the degree of risk that will result in liability under the Eighth Amendment's standard, and that which will not, is a fact-bound inquiry," requiring deference to the trier of fact. *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 455 n.4 (9th Cir. 2013). Here, a jury has already weighed in and found that Valentine was aware of and disregarded not merely a risk of some harm, but a substantial risk of serious harm to Castro.

*Ford* was not a case of two intoxicated strangers being thrown together in the middle of the night, but rather a calm,

reasoned decision made with the input of all the affected parties. Faulting a prison official for disregarding some risk of harm is difficult when the victim himself consented to the risk. Castro, on the other hand, did not consent to being housed with Gonzalez. Gonzalez and Castro had no history together, so Valentine had no basis to conclude that the risk of an altercation was minimal. Although Gonzalez had a lesser history of violence in general than the predator inmate in *Ford*, Gonzalez's combative nature when placed in the cell was in no way mitigated by any prior interaction with Castro.

At the end of the day, this is a fact-specific inquiry. The jury heard evidence that Gonzalez presented a sufficient threat to cause him to be supervised by two officers at all times following his arrest, one of whom was consistently in contact with him. They also heard that, pursuant to jail policy, combative inmates such as Gonzalez were to be housed separately from inmates like Castro, specifically to avoid this type of altercation. The jury was further informed that separate cells were available but left unused that evening.

This evidence was sufficient to allow the jury to find that Valentine knew of but disregarded a substantial risk of serious harm to Castro, and we find no reason to disturb that finding. *See id.* at 459 ("[P]ost-verdict, a court must apply the qualified immunity framework to the facts that the jury found (including the defendant's subjective intent)."). Such a conclusion does not run afoul of this court's holding in *Ford* because of the key factual differences between the two cases.

As with Solomon, the final question then becomes whether Valentine's actions were both an actual and a proximate cause of Castro's harm. The jury determined that they were and, for the reasons discussed above, we will not

set aside that determination. Valentine is therefore not entitled to qualified immunity and may be subjected to liability for his personal involvement in the decision to house Gonzalez and Castro together.

## C. For the purpose of awarding punitive damages, no additional evidence is required to make a finding of "reckless disregard" when a finding of "deliberate indifference" has been made

The individual defendants cursorily argue that the district court's award of punitive damages must be reversed because the evidence does not support such an award. Although the parties stipulated to the eventual amount of the punitive damages entered ($12,000 against Valentine and $6,000 against Solomon), the defendants argued in both their pre- and post-verdict motions for judgment as a matter of law that there was insufficient evidence to support a punitive-damages award. Castro counters that, after hearing the officers testify, the jury might have determined that they demonstrated callousness by their lack of remorse.

Punitive damages may be assessed in § 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). "[T]his threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness," *id.*, because to award punitive damages, the jury must make both a factual determination that the threshold was met and "a moral judgment" that further punishment was warranted, *id.* at 52–53 (recognizing that where the underlying standard of liability is recklessness, a tortfeasor may be subject to both

compensatory and punitive damages without any additional culpable conduct). The decision to impose such sanctions is "within the exclusive province of the jury." *Runge v. Lee*, 441 F.2d 579, 584 (9th Cir. 1971).

The precise distinction between "deliberate indifference" and "reckless or callous indifference" remains an open question. As discussed above, "deliberate indifference" is defined in this circuit as "the conscious choice to disregard the consequences of one's acts or omissions." *See* 9th Cir. Civ. Jury Instr. 9.7 (2007). Furthermore, when the Supreme Court articulated the deliberate-indifference standard for failure-to-protect claims in *Farmer*, it defined the standard as one of criminal recklessness. *See Farmer*, 511 U.S. at 837–39. The circular nature of these definitions gives rise to the inference that the terms are synonymous. Juries in these cases thus have the discretion to impose punitive damages if they believe further punishment above and beyond compensatory damages is appropriate, without having to make any additional factual findings. *See Smith*, 461 U.S. at 56.

As described above, the jury heard sufficient evidence here to find that both individual defendants were deliberately indifferent. Accordingly, it was also free to find that the individual defendants' actions constituted reckless or callous indifference, opening up the possibility of punitive damages. The jury rendered such a judgment here. Because this decision is "within the exclusive province of the jury" so long as the legal prerequisites are met, we will allow the lower court's punitive-damage award to stand. *See Runge*, 441 F.2d at 584.

**D. Castro's *Monell* claim is legally viable but insufficiently proven**

We turn next to the issues raised by the County in this appeal. The County argues that the verdict against it should be reversed for the following three reasons: (1) the Eleventh Amendment bars a finding of liability; (2) if Castro's theory of liability is based on the County's having an informal policy that violated his constitutional rights, then his theory fails because there was no evidence presented of any similar prior incidents; and (3) if Castro's theory of liability is based on the County's having a formal policy that violated his constitutional rights, then his theory is legally untenable.

We begin our analysis by addressing a few fundamental points regarding municipal liability under 42 U.S.C. § 1983. The first point is that although § 1983 imposes liability only on "persons" who, under color of law, deprive others of their constitutional rights, the Supreme Court has construed the term "persons" to include municipalities such as the County. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). A municipality is responsible for a constitutional violation, however, only when an "action [taken] pursuant to [an] official municipal policy of some nature" caused the violation. *Id.* at 691. This means that a municipality is *not liable* under § 1983 based on the common-law tort theory of respondeat superior. *Id.* On the other hand, the official municipal policy in question may be either formal or informal. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1989) (plurality opinion) (acknowledging that a plaintiff could show that "a municipality's actual policies were different from the ones that had been announced"); *id*. at 138 (Brennan, J., concurring) (stating that municipal policies may be formal or informal).

A formal policy exists when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion). When pursuing a *Monell* claim stemming from a formal policy, a plaintiff must prove that the municipality "acted with the state of mind required to prove the underlying violation." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143–44 (9th Cir. 2012) (internal quotation marks omitted) (explaining that the plaintiff must prove that the municipal defendants acted with deliberate indifference, the same standard that a plaintiff has to establish in a § 1983 claim against an individual defendant).

An informal policy, on the other hand, exists when a plaintiff can prove the existence of a widespread practice that, although not authorized by an ordinance or an express municipal policy, is "so permanent and well settled as to constitute a custom or usage with the force of law." *Praprotnik*, 485 U.S. at 127 (internal quotation marks omitted). Such a practice, however, cannot ordinarily be established by a single constitutional deprivation, a random act, or an isolated event. *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). Instead, a plaintiff such as Castro must show a pattern of similar incidents in order for the factfinder to conclude that the alleged informal policy was "so permanent and well settled" as to carry the force of law. *See Praprotnik*, 485 U.S. at 127.

The County's first two arguments can be quickly and easily addressed. First, the claim that the County is protected from suit by the Eleventh Amendment was squarely considered and rejected by this court in *Jackson v. Barnes*,

749 F.3d 755, 764–65 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 980 (2015) (holding that a sheriff's department is a county actor when it investigates crime and supervises a jail, and thus is not protected by the Eleventh Amendment's blanket of immunity for state officials).  The County therefore cannot seek refuge behind the Eleventh Amendment.  Second, and in the County's favor, the record is devoid of any similar incident to that suffered by Castro.  He thus failed to establish that the County had an informal policy in relation to the sobering cell that caused him harm.  The County's liability thus hinges on its final argument, which boils down to (1) whether the design of the sobering cell constitutes a formal County policy and, if so, (2) whether the County was deliberately indifferent to the harm that befell Castro as a result of that formal policy.

### 1.  *The jail's design was a deliberate choice by the County and thus a formal policy*

We cannot envision how a municipality can design a jail without making "a deliberate choice . . . from among various alternatives." *See Pembaur*, 475 U.S. at 483.  Construction projects of any variety involve a series of such choices based on aesthetics, functionality, budget, and other factors.  One would assume that for any given construction project, including jails, the municipality's governing body—or a committee that it appoints to act in its stead—reviews bids, considers designs, and ultimately approves a plan for the facility and allocates funds for its construction.  These choices are sufficient, in our opinion, to meet the definition of a formal municipal policy as set forth in *Pembaur*.

We are unpersuaded by the cases cited by the County in support of its argument to the contrary.  *See Molton v. City of*

*Cleveland*, 839 F.2d 240, 246 (6th Cir. 1988); *Elliott v. Cheshire Cnty.*, 750 F. Supp. 1146, 1156 (D. N.H. 1990), *aff'd in part and vacated in part*, 940 F.2d 7 (1st Cir. 1991); *Shouse v. Daviess Cnty.*, No. 4:06-cv-144-M, 2009 WL 424978, at *8 (W.D. Ky. Feb. 19, 2009) (unpublished); *Richardson v. Dailey*, No. 925996, 1994 WL 879483, at *3 (Mass. Super. Ct. Sept. 29, 1994) (unpublished), *aff'd*, 424 Mass. 258 (1997).  Of these cases, *Molton* is the only one to provide more than a cursory analysis of the jail-design-as-policy issue.

In *Molton*, an inmate hung himself by his shirt in his cell while his fellow inmates screamed for help.  839 F.2d at 242–43.  The administrator of the decedent's estate sued the city under § 1983, alleging that the jail was defectively designed, creating a substantial risk of suicides. *Id.* at 243.  The jury returned a verdict in favor of the estate.  *Id.* On appeal, the city argued that the estate had failed to prove the existence of a municipal policy that caused the suicide. *Id.* at 247.  The estate responded by pointing out several factors contributing to his injury that were "inherently matters of city policy," including the operation of a jail with a cell block that was too remote for easy supervision, the failure to install an audio communication system between the cell block and the office area, and the failure to modify cell architecture to make suicides less likely. *Molton*, 839 F.2d at 246.

In ruling against the estate, the Sixth Circuit found two problems with the estate's argument: (1) Supreme Court caselaw requires a plaintiff to identify a "deliberate and discernible city policy" rather than a series of vague issues with the way the city runs its jail, and (2) the evidence produced by the estate supported, at most, a finding that the city acted negligently in designing the jail.  *Id.* The court in

*Molton* concluded that the city's "failure to build a suicide-proof jail cell" did not constitute "a deliberate choice to follow a course of action" that would be required to impose *Monell* liability.  *Id.* (internal quotation marks omitted). *Elliott*, *Shouse*, and *Richardson* relied on *Molton* in reaching similar conclusions.

*Molton*, however, did not address the series of deliberate choices made by the city that went into the design of the jail itself.  *See id*.  The Sixth Circuit instead considered the "deliberate choice" question only with regard to whether the design was deliberately indifferent to a risk to the inmates (as opposed to whether the design was simply negligent).  *Id.*

To the contrary, we conclude that the question of whether the design of a jail can lead to a constitutional violation (i.e., whether it constituted deliberate indifference on the part of the municipality) is a separate question from the issue of whether the design can be considered a formal policy for *Monell* purposes (i.e., whether the design was a deliberate choice made by a policymaker among a series of alternatives).  With all due respect to our sister circuit, we cannot ignore the plethora of deliberate choices that a municipality makes in designing a jail, and we conclude that those choices render the design a formal municipal policy for the purpose of *Monell* liability.

The design of a jail, in sum, is the result of a series of deliberate choices made by the municipality that built it.  In this case, the County does not contest that it was responsible for the design and operation of the West Hollywood Station. We therefore hold that the County instituted a formal policy under *Monell* with regard to the jail's sobering cell.

### 2. To find that a municipality was deliberately indifferent to a risk, a plaintiff must prove that the municipality had actual knowledge of that risk

Having determined that the County's design of the West Hollywood Station's sobering cell constituted a formal municipal policy, we turn next to the issue of whether that policy violated Castro's constitutional rights. Castro alleged that the County's policy deprived him of the same constitutional right that was violated by the individual defendants—his right to be free from violence at the hands of other inmates. As with the individual defendants, Castro must demonstrate that (1) he faced a substantial risk of serious harm, (2) the County, knowing of the risk, showed deliberate indifference by failing to take reasonable corrective measures, and (3) the County's failure to mitigate the risk was a proximate cause of the harm that he suffered. *See Farmer*, 511 U.S. at 828, 842.

At trial, Castro presented evidence establishing that the state of California had in place a regulation aimed at preventing the very type of harm suffered by Castro. Title 24 of California's Minimum Standards for Local Detention Facilities defines a "sobering cell" as "an initial 'sobering up' place for arrestees who are sufficiently intoxicated from any substance to require a protected environment to prevent injury by falling or *victimization by other inmates*." Cal. Code Regs. tit. 15, § 1006 (emphasis added). In addition, California's Minimum Standards for Adult Detention Facilities provides that "there shall be an inmate- or sound-actuated audio monitoring system in . . . sobering cells . . . *which is capable of alerting personnel who can respond immediately*." *Id*. tit. 24, § 1231.2.22 (emphasis added).

The plain text of this regulation clearly indicates that the state regulators were concerned about inmate-on-inmate violence and required counties to install a compliant audio-monitoring system in order to ensure that the inmates could easily summon help. West Hollywood Station's sobering cell did not have such an audio-monitoring system in place.

Castro argues that, because of the regulation, the County knew of the risk that inmates in a sobering cell face from other inmates but disregarded that risk by failing to take the precautions required by the regulations. The County, on the other hand, argues that there was no evidence presented at trial establishing that it was aware of the regulation. In the absence of such evidence, the County contends that no reasonable jury could have concluded that it knew of the risk to Castro.

Both sides—and, in our view, the dissent—have muddled the issue of knowledge by failing to distinguish between actual versus constructive knowledge. The law has long recognized a distinction between *constructive* knowledge (i.e., what a reasonable person *should have known* in a given situation) and *actual* knowledge (i.e., what a particular person did in fact know in the same situation). *See, e.g.*, *Han v. United States*, 944 F.2d 526, 530 (9th Cir. 1991) (reversing the grant of summary judgment in favor of the IRS because the taxpayer had only constructive knowledge rather than actual knowledge of a lien on his property); *McGinn v. City of Omaha*, 352 N.W.2d 545, 547 (Neb. 1984) (per curiam) (holding that a city could be held liable for personal injuries sustained as a result of its negligence, even in the absence of actual knowledge, if it had the knowledge that a reasonable person would have possessed under the circumstances).

Constructive knowledge is an objective standard, *see Rost v. United States*, 803 F.2d 448, 451 (9th Cir. 1986), whereas actual knowledge is a subjective standard, *see Bus. Guides, Inc. v. Chromatic Commc'ns Enterps., Inc.*, 892 F.2d 802, 810 (9th Cir. 1989), *aff'd*, 498 U.S. 533 (1991).

The Supreme Court has previously determined that subjective (i.e., actual) knowledge is required in order to impose liability under a failure-to-protect claim. In *Farmer*, the Court held specifically that for liability to attach based on a defendant's failure to protect a plaintiff from harm, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. In adopting this test for deliberate-indifference claims, the Supreme Court specifically rejected an objective standard of knowledge (i.e., constructive knowledge) for these claims. *Id.* Even the dissent acknowledges that *Kingsley* did not overrule *Farmer* or otherwise question the existing test for deliberate-indifference claims against the individual defendants. Dissenting Op. at 44, n. 4.

*Farmer* recognized that "conceptual difficult[ies may] attend any search for the subjective state of mind of a governmental entity," *id.* at 841, but these difficulties are not insurmountable. A plaintiff could take any of several paths to prove that a municipality had actual knowledge of a substantial risk of serious harm to inmates. For example, where, as here, there is an applicable regulation that should have put the municipality on notice of the risk, a plaintiff could offer evidence that the municipality had been notified that it was out of compliance with the regulation. Other evidence, such as meeting minutes or other records, that the

regulation was discussed at planning meetings would also suffice, as would evidence that similar incidents had occurred and been brought to the municipality's attention. Regardless of its form, however, some evidence of actual knowledge is required to find that a municipality had the requisite "consciousness of a risk" to be held deliberately indifferent. *Id* at 840.

No such evidence was presented in this case. As the County points out, the only evidence proffered by Castro to establish that the County knew of the risk to Castro's safety was the existence of the state regulation. But this evidence, for the reasons discussed above, establishes only constructive knowledge on the part of the County. Per Castro's own brief, he decided for "tactical reasons" not to present evidence of similar incidents in the past, and he offered no evidence that the regulation in question had ever been specifically brought to the County's attention.

Nor are we persuaded by our dissenting colleague's position that the County had actual knowledge of the regulations in question simply because the County Board of Supervisors adopted them. Dissenting Op. at 41–43. These regulations were neither drafted by the County nor considered individually before adoption. Instead, the Board of Supervisors adopted over 1,300 pages of the California Building Code in one fell swoop, one of which happened to contain the regulation at issue here. Citing *Board of County Commissioners v. Brown*, 520 U.S. 397, 405–06 (1997), the dissent argues that this adoption is "conclusive proof that the County had actual knowledge of the risk of the harm that befell Plaintiff." Dissenting Op. at 41. The Supreme Court's discussion in *Brown*, however, addressed only specific, targeted municipal actions. *See id.* (discussing a city

council's censure and discharge of an employee and cancellation of a performance license due to the content of the performance).  Were any such specific, targeted actions present here, we would wholeheartedly agree with the dissent that the County had actual knowledge of the regulation at issue.  In the absence of any such proof, however, the fact that no one found this proverbial "needle in a haystack" simply confirms our view that we are dealing with constructive knowledge rather than actual knowledge on the part of the County.

The dissent finally argues that we should "hold, as a matter of law, that entities have actual knowledge of (1) laws that they enact, including those adopted by incorporation, and (2) state regulations governing their conduct."  Dissenting Op. at 41.  We find this proposition perplexing.  Knowledge that an individual or an entity is deemed to have as a matter of law is, by definition, constructive knowledge. *Black's Law Dictionary* (10th ed. 2014) ("[C]onstructive knowledge [is] [k]nowledge that one using reasonable care or diligence should have, and therefore that is *attributed by law* to a given person." (emphasis added)).  As discussed at length above, constructive knowledge is insufficient to impose liability for a failure-to-protect claim, and actual knowledge cannot, from a definitional standpoint, be imputed as a matter of law.  Our dissenting colleague, understandably, is unable to cite any authority in support of her novel proposition.

Finally, we recognize that the question of what constitutes deliberate indifference is one of fact, such that we generally owe the jury's conclusion substantial deference. *Grenning v. Miller-Stout*, 739 F.3d 1235, 1239 (9th Cir. 2014) (citing *Johnson v. Lewis*, 217 F.3d 726, 734 (9th Cir. 2000)).  But without any evidence whatsoever that the County had actual

knowledge of the risk to Castro's safety, the verdict against the County cannot stand.

## E. Castro presented sufficient evidence regarding the amount of his past damages from which the jury could reasonably calculate the amount of future damages

The defendants' final argument is that the jury's future-damages award of $600,000 should be reversed because it was based on pure speculation as to the amount of such damages. We find this argument to be without merit.

The parties agree that California law applies for purposes of calculating damages in this case. *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 256 (1969) (directing lower courts to "look to state law to find appropriate remedies when the applicable federal civil rights law is 'deficient in the provisions necessary to furnish suitable remedies'" (quoting 42 U.S.C. § 1988(a))). Under California law, an award of damages may include an amount to compensate for related expenses that are "certain to result in the future." Cal. Civ. Code § 3283. "However, the 'requirement of certainty . . . cannot be strictly applied where prospective damages are sought, because probabilities are really the basis for the award.'" *Behr v. Redmond*, 123 Cal. Rptr. 3d 97, 111 (Cal. Ct. App. 2011), *as modified* Mar. 25, 2011 (quoting 6 Witkin, Summary of Cal. Law Torts, § 1552 (10th ed. 2005)).

The defendants' repeated assertions that Castro has "set forth no admissible evidence to establish any foundation whatsoever for the amount of future expenses" are simply not supported by the record. Castro submitted the billing records from both his cognitive assistant and his treating psychologist, and he also submitted a chart detailing the

charges for the almost $1 million in medical expenses that he had already incurred. He also proffered several medical experts who testified to his need for ongoing medical care and described the approximate scope of that care.

California courts have consistently approved damage awards for future medical expenses based on this type of evidence. *See, e.g.*, *id.* at 113 (approving a future-damages award based on the cost of a medication as established by past records multiplied by the plaintiff's estimated life span); *Cooper v. Chambi*, No. G028318, 2002 WL 31086128, at *3 (Cal. Ct. App. Sept. 9, 2002) (unpublished) (finding that past bills for psychological services totaling $125 per week could provide a jury with reasonable certainty as to the future cost of psychological services, but could not alone sustain a $1.5 million future-damages award).

The defendants also object to the future-damages award because they argue that it was not reduced to present value. They have a point to the extent that such an award is subject to a present-value reduction. *See Fox v. Pac. Sw. Airlines*, 184 Cal. Rptr. 87, 89 (Cal. Ct. App. 1982) (holding that "recovery for lost future benefits must be discounted to present value") (citing *Bond v. United R.R.s of S.F.*, 113 P. 366, 372 (Cal. 1911)). But they overstate the role of experts in establishing the appropriate discount. The California Civil Jury Instruction that they cite simply states that expert testimony is "usually" required to accurately establish present values, and *Niles v. City of San Rafael*, 116 Cal. Rptr. 733, 740 (Cal. Ct. App. 1974), on which they rely, similarly observes that actuarial testimony is "frequently" used for this purpose.

However common the use of experts may be, no California court has ever held that expert testimony is an absolute requirement in order to establish the present value of a future-damages award. The district court instructed the jury to reduce its award of future damages to present value according to the Ninth Circuit's Model Civil Jury Instructions, and we have no reason to believe that the jury ignored that instruction, particularly because the jury awarded only slightly more than half of the amount requested.

In sum, although no expert testified as to the precise rate of reduction to be applied, the court instructed the jury to reduce its award for future damages to present value, and "we must assume that the jury followed the court's instructions." *See Gray v. Shell Oil Co.*, 469 F.2d 742, 752 (9th Cir. 1972). Our assumption seems fully justified by the fact that the future damages awarded to Castro reflected a 42 percent discount from the amount requested. Particularly in light of this discount, we are not persuaded that this is the appropriate case in which to make the use of experts to establish the present value of future damages an absolute requirement under California law. We therefore decline to disturb the award for future damages.

## III. CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court against the individual defendants but **REVERSE** the judgment against the County. Each party shall bear its own costs.

CALLAHAN, Circuit Judge, concurring:

I agree with the majority that the judgment of the district court against the individual defendants should be affirmed and the judgment against the County reversed. I write separately to explain that I do not think that Castro has shown that the design of the West Hollywood Station constitutes a policy for purposes of liability under *Monell v. Department of Social Services of New York.*, 436 U.S. 658 (1978).

I do not deny that pursuant to *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986), the design of a jail in some circumstances, might be held to constitute a deliberate choice or policy. However, I disagree with the suggestion that the fact that the jail was constructed is sufficient in itself to "meet the definition of a formal municipal policy." Maj. at 27. Rather, I agree with the Sixth Circuit's approach in *Molton v. City of Cleveland*, 839 F.2d 240, 246 (6th Cir. 1988), that "*Pembaur*[] require[s] proof of a deliberate and discernible city policy to maintain . . . inadequately designed and equipped jails; not mere speculation that such matters are 'inherently matters of city policy.'"

Here, the record contains no evidence to suggest that the design and construction of the West Hollywood Station implicated a relevant policy choice. The record indicates that the West Hollywood Station is many decades old. Municipal facilities are built to suit the needs of their times, according to the then existing applicable statutes and regulations. Other than their mere existence, there is no evidence in this record to indicate that the relevant design features of the West Hollywood Station were policy choices of the County. Although both the County and Castro presented evidence of measures that could be taken to increase supervision in the

sobering cell, no evidence was presented that the County specifically considered these measures or made a deliberate choice to reject them at the time of the facilities' construction, or even at any time thereafter. Nor was any evidence presented, such as past instances of injury or modifications made since the Station's construction, that might support an inference that the County considered but rejected such design features.

Accordingly, I would hold that Castro has failed to show that the design of the West Hollywood Station constituted a formal policy under *Monell*, 436 U.S. 658. Nonetheless, I concur in the opinion as I agree that even if there was a formal policy, Castro has failed to show the requisite deliberate indifference for *Monell* liability.[1]  *See* Maj. at 30–35.

GRABER, Circuit Judge, concurring in part and dissenting in part:

I join the majority opinion, with the exception of Part II.D.2. I respectfully dissent from the holding that there was insufficient evidence from which the jury could have concluded that the entity Defendants were deliberately

---

[1] I agree with Judge Gilman that *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), does not clearly establish a new or different test for a failure-to-protect claim. *See* Maj. Op. 13–16. Moreover, even assuming the application of an "objective" intent test, the County's adoption of certain chapters of the California Building Code, including criteria for 'sobering cells" — some decades after the construction of the West Hollywood Station — would not, by itself, meet that objective intent test.

indifferent to the risk that Plaintiff would be harmed by a fellow inmate. I also write separately because the Supreme Court's recent decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees.

A. *The entity Defendants had actual knowledge of state regulations governing their conduct and were deliberately indifferent.*

In *Farmer v. Brennan*, 511 U.S. 825, 841 (1994), the Supreme Court acknowledged that "considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official."[1] This case squarely presents that considerable conceptual difficulty.

We previously have acknowledged that certain types of evidence could show that an entity possesses subjective knowledge:

> First, it is certainly possible that a municipality's policies explicitly acknowledge that substantial risks of serious harm exist. Second, numerous cases have held that municipalities act through their policymakers, who are, of course, natural

---

[1] As I explain in Part B, I question whether proof of subjective indifference is required in a Fourteenth Amendment case after the Supreme Court's decision in *Kingsley*. This section assumes, consistent with our precedent, that *Farmer* still applies to a claim arising under the Fourteenth Amendment.

persons, whose state of mind can be determined.

*Gibson v. County of Washoe*, 290 F.3d 1175, 1188 n.10 (9th Cir. 2002). But those two types of evidence are not the *only* way to show such knowledge. Here, as the majority explains, state regulations applicable to the County anticipated the precise harm that befell Plaintiff and required a particular audio-monitoring system to prevent that harm. Moreover, the County affirmatively adopted those same regulations into its municipal code. I would hold, as a matter of law, that entities have actual knowledge of (1) laws that they enact, including those adopted by incorporation, and (2) state regulations governing their conduct.

At the time of the attack in this case, the Los Angeles County Code "adopted by reference and incorporated into . . . the Los Angeles County Code as if fully set forth below" certain chapters of the California Building Code, including chapter 12, which includes the regulation requiring that sobering cells be equipped with an audio-monitoring system.[2] L.A. County Code, tit. 26, ch. 1, § 100 (2007). The County Board of Supervisors' affirmative adoption of a regulation aimed at mitigating the risk to individuals housed in sobering cells is conclusive proof that the County had actual knowledge of the risk of the harm that befell Plaintiff. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405–06 (1997)

---

[2] Even though the county code provision was not in evidence in the district court, we may take judicial notice of it because it is "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 (9th Cir. 2006); *see id.* at 1026 n.2 (holding that local ordinances are "proper subjects for judicial notice").

(describing *Owen v. City of Independence*, 445 U.S. 622 (1980), and *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), as municipal liability cases involving "no difficult questions of fault" because they involved "formal decisions of municipal legislative bodies").

But I would not require such an affirmative act to show that an entity possesses the requisite knowledge to support a finding of deliberate indifference; I also would hold, as a matter of law, that governmental entities, as distinct from individuals employed by those entities, know the statutes and regulations governing their conduct. The majority contends that such a rule impermissibly equates actual knowledge with constructive knowledge. Maj. op. at 33–34. It is true that the Supreme Court has written that, in actions against individuals and entities alike, a plaintiff must establish that the defendant possessed the "state of mind required to prove the underlying violation." *Brown*, 520 U.S. at 405. But I do not think that the Court meant for us to ignore salient differences between individuals and entities.

In *Davis v. Scherer*, 468 U.S. 183, 196 (1984), the Court held that *individual* officers are not deemed to have knowledge of the "voluminous, ambiguous, and contradictory" regulations governing their conduct. (Internal quotation marks omitted.) The Court explained that officers "must often act swiftly and firmly," precluding "an extensive inquiry into . . . the applicability and importance of the rule at issue" and "the possible legal consequences of their conduct." *Id.* at 195–96 (internal quotation marks omitted). That reasoning does not apply to *entities*, which by definition do not make the sort of time-pressured decisions that individual officers make. Moreover, because an entity does not have an actual mind, the question of what the entity

"knows" is different from the question of what an individual "knows." *Cf. United States v. 7326 Highway 45 N.*, 965 F.2d 311, 316 (7th Cir. 1992) ("As a legal fiction, a corporation cannot 'know' like an individual 'knows.'").**[3]**  In light of these differences between entities and individuals, I would hold that where, as here, positive law applicable to the entity speaks directly to the risk of harm that befell a plaintiff, the entity defendant has the requisite knowledge of that risk to disregard it deliberately.

B. *Recent Supreme Court precedent calls into question our caselaw governing Fourteenth Amendment failure-to-protect claims.*

As explained above, I would hold, as a matter of law, that the entity Defendants had actual knowledge of the risk to Plaintiff and were deliberately indifferent to that risk.  But after the Supreme Court's decision in *Kingsley*, I doubt that actual knowledge is necessary to support a finding of deliberate indifference under the Fourteenth Amendment.  In my view, *Kingsley* undermines *Clouthier v. County of Contra*

---

**[3]** Were we writing on a blank slate, one possible resolution of the conceptual difficulty here would be to hold that entities cannot be held liable for constitutional violations when the underlying violation requires *subjective* intent.  Indeed, the Supreme Court has taken that course in a different context.  *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267 (1981) (holding that punitive damages cannot sensibly be assessed against a governmental entity because the entity "can have no malice independent of the malice of its officials").  But that option is not open to us, because the Supreme Court clearly has stated that municipalities can have subjective knowledge and intent for the purposes of § 1983 liability.  *See Brown*, 520 U.S. at 405 (holding that "proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably").

*Costa*, 591 F.3d 1232, 1243 (9th Cir. 2010), in which we held that proof of such knowledge is required.[4]

A pretrial detainee's right to be protected from harm at the hands of other inmates stems from the Due Process Clause of the Fourteenth Amendment, rather than from the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Gibson*, 290 F.3d at 1187. Notwithstanding those different constitutional sources, in *Clouthier*, 591 F.3d at 1242–43, we held that the Eighth and Fourteenth Amendment standards are identical for failure-to-protect claims. Accordingly, we held that the standard imposed by *Farmer*—which involved an Eighth Amendment claim brought by a convicted prisoner—applied to claims brought by pretrial detainees. *Id.* at 1242.

In *Kingsley*, 135 S. Ct. at 2475, the Supreme Court held that excessive force claims brought by convicted prisoners under the Eighth Amendment's Cruel and Unusual Punishment Clause differ qualitatively from excessive force claims brought by pretrial detainees under the Fourteenth Amendment's Due Process Clause. Under *Kingsley*, a pretrial detainee, unlike a convicted prisoner, need not prove that the defendant *subjectively* knew that the force applied was excessive; that state-of-mind inquiry is "solely . . . *objective*." *Id.* at 2473 (emphasis added).

---

[4] Despite the considerable tension between *Kingsley* and our precedent, the conflict may not be sufficient to meet the "high bar" that would authorize our panel to depart from that precedent. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). For that reason, I do not dissent from the majority's description of the appropriate state-of-mind inquiry for the individual defendants.

There are important differences between excessive force and failure-to-protect claims; notably, a failure-to-protect claim does not necessarily involve an affirmative act by the defendant.**[5]**  But there also are important similarities.  Most significantly, the claims share constitutional sources; they are drawn from the Fourteenth Amendment for pretrial detainees, but from the Eighth Amendment for convicted prisoners.  Therefore, the reasoning of *Kingsley* is in serious tension, if not outright conflict, with the reasoning of *Clouthier*.  *See Miller*, 335 F.3d at 900 ("[T]he issues decided by the higher court need not be identical in order to be controlling.  Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.").

*Clouthier* provided a single rationale for holding that the *Farmer* test applied equally to Eighth and Fourteenth Amendment claims:  It read *Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979), to require proof of punitive intent for failure-to-protect claims, whether those claims arise in a pretrial or a post-conviction context.  *Clouthier*, 591 F.3d at 1241–43.  But *Kingsley* rejected precisely that reading of *Bell*; although unconstitutional "'punishment'" of pretrial detainees "*can* consist of actions taken with an 'expressed intent to punish,'" proof of such intent is not required.  *Kingsley*, 135 S. Ct. at 2473 (emphasis added) (quoting *Bell*,

---

**[5]** I disagree with the majority's statement that we evaluate excessive force claims, as distinct from deliberate indifference claims, without regard to "whatever thoughts, knowledge, or motivation" drove the defendant's actions. Maj. op. at 14.  When a convicted prisoner brings an excessive force claim, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

441 U.S. at 538). In evaluating the challenged prison conditions in *Bell*, the Court "did not consider the prison officials' subjective beliefs about the policy. Rather, the Court examined objective evidence . . . before concluding that the conditions were reasonably related to the legitimate purpose of holding detainees for trial and did not appear excessive in relation to that purpose." *Id.* (citing *Bell*, 441 U.S. at 541–43). Thus, *Clouthier*'s reading of *Bell*, as requiring a subjective state-of-mind inquiry with respect to awareness of the risk, cannot survive *Kingsley*. And because *Clouthier*'s *only* reason for applying the same test in the Eighth and Fourteenth Amendment contexts was that now-defunct reading of *Bell*, it is questionable whether *Clouthier* remains good law on this point.

Moreover, *Kingsley* emphasized the importance of the constitutional source of the asserted right: "The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically." 135 S. Ct. at 2475 (internal quotation marks omitted). In light of *Kingsley*'s focus on the differences between the relevant constitutional provisions, we ought not apply a decision grounded in the Eighth Amendment to a claim arising under the Fourteenth Amendment. *Cf. Graham v. Connor*, 490 U.S. 386, 393–94 (1989) ("We reject this notion that all excessive force claims brought under § 1983 are governed by a single generic standard. As we have said many times, § 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." (internal quotation marks omitted)). Thus, I do not think that either *Clouthier* or *Farmer* fully answers what state-of-mind inquiry is required in this case.

Because I would hold that the entity Defendants had actual knowledge of the risk to Plaintiff, *Kingsley* would not change the outcome that I would reach even if we were not bound to follow *Clouthier*. Both the Supreme Court and we have held that the due process rights of a pretrial detainee are *at least* as great as the Eighth Amendment protections available to a convicted prisoner. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (citing *Bell*, 441 U.S. at 535 n.16); *accord Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120, 1121 n.11 (9th Cir. 2003). Thus, proof that a defendant had actual knowledge of the risk of harm, which amounts to proof that actions were taken "with an 'expressed intent to punish,'" *Kingsley*, 135 S. Ct. at 2473 (quoting *Bell*, 441 U.S. at 538), necessarily satisfies the Fourteenth Amendment state-of-mind inquiry.

But, in my view, *Kingsley* strongly suggests that proof of actual knowledge of the risk is not required for a claim arising under the Fourteenth Amendment. In *Kingsley*, the Supreme Court explained that, in an excessive force case,

> there are . . . two separate state of mind questions. The first concerns the defendant's state of mind with respect to his physical acts—*i.e.*, his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns the defendant's state of mind with respect to whether his use of force was "excessive."

*Id.* at 2472. As to the first inquiry, the Court stated that "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind," because "'liability for *negligently*

inflicted harm is categorically beneath the threshold of constitutional due process.'" *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). By contrast, for the second inquiry, a pretrial detainee need provide "only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 2473–74. In the excessive force context, that step requires the plaintiff to demonstrate that the force used was "objectively unreasonable." *Id.* at 2473.

*Farmer* sets up an analogous two-part state-of-mind inquiry for failure-to-protect claims. In order to be deemed "deliberately indifferent" to a particular risk under the Eighth Amendment, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Under *Kingsley*, the first part of the standard—requiring subjective awareness of facts giving rise to an inference of a substantial risk of serious harm—remains unchanged.[6] But I read *Kingsley* to suggest that, for claims arising under the Fourteenth Amendment, a plaintiff need only show that a reasonable person in the defendant's shoes would draw that inference.[7]

---

[6] And the act or omission itself still must be intentional or possibly reckless. For example, a guard who fails to take action because he or she has suddenly fallen ill would not be deliberately indifferent.

[7] This case illustrates why it is important that our precedent get this issue right. Applying the post-*Kingsley* standard outlined in this section, the majority would reach a different conclusion regarding the entity Defendants' liability, because we agree that the state regulations put the entity Defendants on at least constructive notice that the failure to install an inmate- or sound-actuated audio-monitoring system exposed inmates

For the foregoing reasons, I would affirm the jury's verdict against the entity Defendants. I therefore dissent from Part II.D.2.

to a substantial risk of violence at the hands of other inmates. We ought to rehear this case en banc so that we can take up this important issue.